(Nos. 68406, 68527 cons.—

UNION ELECTRIC COMPANY, Appellee, v. THE DEPARTMENT OF REVENUE, Appellant.—GEORGIA POWER COMPANY, Appellee, v. ARCH OF ILLINOIS, INC. (Roger D. Sweet, Director of Revenue, *et al.*, Appellants).

*Opinion filed May 30, 1990.*

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Jennifer A. Keller, Assistant Attorney General, of Chicago, of counsel), for appellants.

Thompson & Mitchell, of Belleville (Robert L. Broderick and Mark J. Stegman, of counsel), for appellee Union Electric Co.

Richard A. Hanson, Nancy T. Owens and Diane E. Olson, of McDermott, Will & Emery, of Chicago (John E. Gaggini and David J. Duez, of counsel), for appellee Georgia Power Co.

JUSTICE CLARK delivered the opinion of the court:

At issue in this consolidated appeal is whether the purchases of coal from Illinois companies by nonresident power companies for use in their out-of-state power generating facilities are subject to the Illinois Use Tax Act

(Use Tax Act) (Ill. Rev. Stat. 1987, ch. 120, par. 439.1 *et seq.*) or the Retailers' Occupation Tax Act (ROTA) (Ill. Rev. Stat. 1987, ch. 120, par. 440 *et seq.*). In No. 68406, both the trial court and the appellate court held that appellee, Union Electric Company (Union Electric), was not liable for the use tax. The same conclusion was reached by both the trial court and the appellate court in No. 68527 with respect to appellee Georgia Power Company (Georgia Power). Upon petition by the Illinois Department of Revenue (Department), we granted leave to appeal pursuant to Rule 315(a) (107 Ill. 2d R. 315(a)) and consolidated the two cases. For the reasons that follow, we affirm the judgments of the appellate court.

*No. 68486*

Appellee, Union Electric, is a Missouri corporation authorized to do business in Illinois. From 1981 through 1984 Union Electric purchased coal from two coal mining operations, Old Ben Coal Company (Old Ben) and Inland Steel Coal Company (Inland), located in Franklin County, Illinois, for use in its Meramec power plant located in Missouri.

Union Electric's power plant in Missouri is not equipped to receive coal shipments by rail, but is equipped to receive coal shipments by barge. Consequently, the coal was shipped via the Missouri Pacific Railroad Company, a common carrier, from the mines in Franklin County to Cora Dock Corporation located at Cora, Illinois, on the Mississippi River. At Cora Dock, the coal received from Inland was loaded onto barges operated by Federal Barge Lines, Inc., a common carrier, and transported across the Mississippi River to Union Electric's Meramec plant; the coal received from Old Ben was transported to Meramec by United Barge Company, a common carrier.

In April 1985, following an audit of Union Electric's books covering the period from July 1, 1981, to June 30, 1984, the Department notified Union Electric that a sum of $4,235,861 was due and owing under the Use Tax Act. An additional amount of $211,793 in penalties and $2,227,962.43 in interest made the total amount claimed by the Department to be $6,675,616.43.

Union Electric paid the entire amount under protest and filed suit in Sangamon County seeking declaratory and injunctive relief against the Department. Union Electric argued that it was not liable for use tax as a result of these transactions because neither Union Electric, nor its representative, took delivery or used the coal in Illinois.

The circuit court of Sangamon County determined that Union Electric was exempt from the requirements of the Use Tax Act because neither Union Electric nor its representative had received possession of the coal in Illinois. The appellate court affirmed this decision with one justice dissenting. 180 Ill. App. 3d 1.

*No. 68527*

Appellee, Georgia Power, is a Delaware corporation not authorized to do business in Illinois. It does not maintain any offices, facilities or places of business in Illinois and does not have any employees located in Illinois. During December 1987, the period at issue, Georgia Power purchased coal from Arch of Illinois, Inc. (Arch), an Illinois corporation, located in Perry County, Illinois, for use in its power plants located in the State of Georgia. Pursuant to a contract between Georgia Power and Arch, coal mined by Arch at its mines was loaded onto rail cars leased by Arch from a third party. The coal was transported via the Missouri Pacific Railroad, a common carrier, to Ford Dock, a coal loading facility located near Chester, Illinois, on the Mississippi

River. At Ford Dock, the coal was loaded onto river barges owned and operated by Central Barge Lines, Inc. (Central Barge), a common carrier, and was transported by barge to Georgia Power's transloading facility in Pride, Alabama. From Pride, the coal was transported to Georgia Power's power generating facilities located in Georgia.

In 1987, the Department claimed that Georgia Power owed use tax in the amount of $250,440.13 for the month of December 1987. Georgia Power paid that amount to Arch, under protest, which in turn paid the money, under protest, to the Department. Subsequently, Georgia Power filed suit in Sangamon County seeking declaratory and injunctive relief against the Department, contending that no retailers' occupation tax was due from Arch, and no use tax was due from Georgia Power, because Georgia Power did not take delivery of the coal in Illinois.

The circuit court of Sangamon County determined that there was no delivery of coal within the State of Illinois to either Georgia Power or its representative and, consequently, Arch was exempt from retailers' occupation tax and Georgia Power was exempt from use tax. The appellate court affirmed this decision with one justice dissenting. 180 Ill. App. 3d 1109 (unpublished order under Supreme Court Rule 23).

The Illinois use tax is a tax on the privilege of using tangible personal property within this State. (*United Air Lines, Inc. v. Johnson* (1981), 84 Ill. 2d 446, 449.) Section 3 of the Use Tax Act provides:

> "A tax is imposed upon the privilege of using in this State tangible personal property ***. Such tax is at the rate of 5% of either the selling price or the fair market value, if any, of such property as provided herein." (Ill. Rev. Stat. 1987, ch. 120, par. 439.3.)

"Use" is defined as "the exercise by any person of any right or power over tangible personal property incident to the ownership of that property." (Ill. Rev. Stat. 1987, ch. 120, par. 439.2.) The Use Tax Act further provides:

> "If the seller of tangible personal property for use would not be taxable under the Retailers' Occupation Tax Act despite all elements of the sale occurring in Illinois, then the tax imposed by this Act shall not apply to the use of such tangible personal property in this State." (Ill. Rev. Stat. 1987, ch. 120, par. 439.3.)

The Retailers' Occupation Tax Act (ROTA) (Ill. Rev. Stat. 1987, ch. 120, par. 440 *et seq.*) complements the Use Tax Act. Retailers who collect the use tax are relieved of liability for the retailers' occupation tax. Ill. Rev. Stat. 1987, ch. 120, par. 439.8.

The Department has promulgated regulations to assist it in applying the ROTA and Use Tax Act to sales of property originating in Illinois. These regulations have the force and effect of law, and must be construed under the same standards which govern the construction of statutes. (*Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58.) Section 130.605 of the regulations, which deals with the sales of property originating in Illinois, provides:

> "a) Where tangible personal property is located in this State at the time of its sale *** and then delivered in Illinois to the purchaser, the seller is taxable if the sale is at retail.
>
> 1) The sale is not deemed to be in interstate commerce if the purchaser or his representative receives the physical possession of such property in this State.
>
> 2) This is so notwithstanding the fact that the purchaser may, after receiving physical possession of the property in this State, transport or send the property out of the State for use outside the State or for use in the conduct of interstate commerce.

* * *

c) *** [T]he tax [does not] apply to gross receipts from sales in which the seller, by carrier (when the carrier is not also the purchaser) or by mail, under the terms of his agreement with the purchaser, delivers the goods from a point in this State to a point outside this State not to be returned to a point within this State.

d) The place at which title to the property passes *** is immaterial. *** Sales of the type described in Subsections (b) and (c) of this Regulation are deemed to be within the protection of the Commerce Clause of the Constitution of the United States." 86 Ill. Admin. Code §§130.605(a), (a)(1), (a)(2), (c), (d) (1985).

The Department argues that, under the regulations, the appellees received possession of the coal in Illinois and that they should be subject to the provisions of the Use Tax Act. Because much of the Department's argument is based on the specific provisions in the contracts and shipping documents involved, we will discuss each case separately.

*No. 68486*

## UNION ELECTRIC—INLAND TRANSACTION

Union Electric's purchase orders, used to buy coal from Inland, require that the coal be shipped "via the MoPac R.R. to the Cora Dock, Cora, Illinois, for transshipment beyond to Union Electric's Meramec Plant *** in Federal Barge Lines barges." The railroad freight costs were prepaid by Inland. The original invoices specified that the coal was to be "f.o.b. mine" and was to be shipped to Labadie Plant, West Labadie, Missouri. The purchase order was later changed to provide that the coal was to be "f.o.b. Cora Dock" and was to be shipped to Meramec. Correspondence from Inland to the Missouri Pacific Railroad Company evidences that the coal was shipped either to the Cora Dock terminal or to the

Union Electric Company, Meramec Plant, via Cora Docks.

## UNION ELECTRIC—OLD BEN TRANSACTION

Union Electric's contract with Old Ben provided for the coal to be delivered to Federal Barge for shipment to Meramec. The agreement provided:

> "[C]oal shall be shipped by Seller for destination Buyer's Rush Island or Meramec plant, or at Buyer's request, any other of Buyer's power plants in Missouri. *** Where destination is any of said power plants with barge unloading facilities, shipments shall be for delivery to Federal Barge Lines, a common carrier, or other designated barge common carrier, F.O.B. designated dock for further shipment to Buyer's destination power plant in Missouri. Buyer shall be responsible for scheduling coal shipments via common carrier acceptable to both parties and for unloading coal at its power plants in Missouri."

Union Electric agreed to reimburse Old Ben for all freight costs paid by Old Ben, except for certain penalties.

The shipping documents utilized by the Missouri Pacific Railroad Company in conjunction with the shipment of coal from Old Ben identify Old Ben as the shipper and "Cora Dock Transfer A/O Union Electric Meramec Plant Meramec, MO" as the consignee.

## UNION ELECTRIC—CORA DOCK TRANSACTION

All of the coal mined by Inland and Old Ben was delivered by rail to Cora Dock. Pursuant to a contract between Union Electric and Cora Dock, Union Electric was to arrange with the coal supplier to load cars for the transport of coal to Cora Dock (the Terminal) and bore all charges for loading and transporting coal from the mine to the Terminal. Cora Dock was to receive unit train deliveries of coal, unload the trains within four

hours after arrival, transfer the coal to river barges, and transport and deliver the coal by river barge to Union Electric's Meramec generating plant in Missouri. All of the arrangements for the barges, including the selection of United Barge Company, a common carrier, were made by Cora Dock. The contract between Union Electric and Cora Dock specifically provides that "Cora shall have exclusive control of the methods of unloading, transfer and loading of barges at the Terminal and of transporting and delivering the coal to the Plant." Additionally, Cora Dock was required to obtain cargo insurance on the coal from the time the coal was unloaded at the Terminal until it was delivered at Meramec, with Union Electric named as an additional insured.

Bills of lading used for the barge shipments from Cora Dock to the Meramec plant show Cora Dock as the consignor and Union Electric as the consignee.

*No. 68527*

### GEORGIA POWER—ARCH TRANSACTION

Georgia Power's contract with Arch provided that the coal would be delivered by the seller f.o.b. barges at Ford Dock. Pursuant to the contract, Georgia Power was responsible for providing the barges and was required to reimburse Arch for the costs of transporting and loading the coal onto barges. Waybills issued by the Missouri Pacific Railroad indicate that the coal was shipped by Arch to Arch at Ford Dock and that the coal was then shipped by Central Barge to Georgia Power, the consignee.

### GEORGIA POWER—CENTRAL BARGE LINE TRANSACTION

Georgia Power originally entered into an agreement with Valley Line Company (Valley Line) to ship coal from

Ford Dock to Pride, Alabama. Valley Line assigned its interest in the contract to Central Barge, a common carrier and an affiliate of Valley Line. Pursuant to the contract, Central Barge transported the coal from Ford Dock to Pride, Alabama. The waybills issued by the railroad show that the coal was shipped from Ford Dock by Central Barge, the shipper, to Georgia Power, the consignee.

Based on these arrangements, the Department contends that Cora Dock and Central Barge were Union Electric's and Georgia Power's respective representatives for purposes of receiving physical possession of the coal and that the transactions are taxable. We do not agree.

This court has previously held that a transaction by which a purchaser buys goods which are delivered to him, or his representative, within the taxing State may properly measure a tax, even though both parties know that the goods are purchased for use outside of the State and they are so used. (*American Airlines, Inc. v. Department of Revenue* (1974), 58 Ill. 2d 251, 259; *Pressed Steel Car Co. v. Lyons* (1955), 7 Ill. 2d 95, 98-99.) The Department contends that Cora Dock and Central Barge were the purchasers' representatives for purposes of the Use Tax Act, and delivery of the coal to Cora Dock and Central Barge constituted delivery to the purchasers. The appellees contend that Cora Dock and Central Barge were not their representatives and that possession with power to control was deferred until actual delivery to the out-of-state facilities. Thus, the first question we must decide is whether Cora Dock or Central Barge acted as the appellees' representatives when they received physical possession of the coal.

The Department's regulations do not define the term "representative." Consequently, the appellees argue that we should apply the definition given to that term in the

Uniform Commercial Code (UCC). (See *Sinclair Refining Co. v. Department of Revenue* (1971), 50 Ill. 2d 201, 205-06; *O'Brien v. Isaacs* (1965), 32 Ill. 2d 105, 107 (cases which applied the definitions found in the UCC in construing the provisions of the ROTA).) Section 1—201(35) of the UCC defines a "representative" as:

> "an agent, an officer of a corporation or association, and a trustee, executor or administrator of an estate, or any other person empowered to act for another." (Ill. Rev. Stat. 1987, ch. 26, par. 1—201(35).)

The appellees maintain that in the present case, neither Cora Dock nor Central Barge was "empowered to act" on their behalf. Union Electric contends that Cora Dock was an independent contractor whose authority was limited to the transfer of coal from the rail cars to the river barges; Georgia Power contends that Central Barge was an independent common carrier whose responsibilities were limited to transporting coal by barge from Ford Dock, Illinois, to Pride, Alabama. Under these circumstances, the appellees argue that Cora Dock and Central Barge were not their "representatives" as the term is defined in the UCC.

The Department argues that although the term "representative" is not defined in its regulations, the Department construes that term to be broader than the definition contained in the UCC. The Department does not restrict the term to agents and employees, but construes the term to mean one who stands in the place of another for the purpose of receiving physical possession of property, and urges this court to adopt that construction. In arguing that Cora Dock was acting as a representative of Union Electric, the Department places considerable emphasis on the facts that the coal was shipped f.o.b. mine or Cora Dock and that Union Electric scheduled the coal shipments and either paid the freight costs outright or reimbursed the seller for the freight costs. As to

Georgia Power, the Department argues that the facts that the seller shipped the coal f.o.b. Ford Dock, that Georgia Power reimbursed the seller for the cost of transporting the coal to the dock and loading it onto barges, and that Georgia Power contracted for the shipment of the coal by barge support its position that Central Barge was acting as Georgia Power's representative.

We agree with the Department that the term "representative" is not limited to those acting in an agency capacity. When a statutory term is undefined, that term must be given its ordinary and popularly understood meaning. (*Canteen Corp. v. Department of Revenue* (1988), 123 Ill. 2d 95, 105; *Lake County Board of Review v. Property Tax Appeal Board* (1988), 119 Ill. 2d 419, 423.) A common definition of the term "representative" is one who "stand[s] for or in the place of another: act[s] for another or others: constitut[es an] agent for another [especially] through delegated authority." (Webster's Third New International Dictionary 1926 (1986).) Thus, while a representative can be an agent, he need not be one.

We nonetheless find that Cora Dock and Central Barge were not the appellees' representatives as contemplated by the regulations. Our review of the record indicates that Cora Dock is a coal transfer facility which, pursuant to the contract between it and Union Electric, is responsible for the transfer of coal from railroad cars to river barges. The bills of lading clearly indicate that Cora Dock, not Union Electric, was the shipper of the coal to Meramec. A review of the Georgia Power transaction similarly establishes that Central Barge was acting as a common carrier in transporting the coal from Ford Dock to Pride, Alabama, and that Georgia Power was the consignee. It is clear that reloading was a necessity of the carriage from the mines to the plants and

there is no evidence to indicate that Cora Dock or Central Barge had authority to do anything with the coal other than facilitate its transportation. Consequently, we hold that the purchasers did not, either personally or through their representatives, receive physical possession of the coal within Illinois.

We note that the Department has submitted, as additional authority, citation to a virtually identical provision contained in the home rule municipal retailers' occupation tax act (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—1), the county retailers' occupation tax act (Ill. Rev. Stat. 1987, ch. 34, par. 409.1), the Local Mass Transit District Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 355.01(b)) and the Regional Transportation Authority Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 704.03(e)), apparently as support for its position that the appellees received possession of the coal in Illinois. Those provisions state:

"For the purpose of determining the local governmental unit whose tax is applicable, a retail sale, by a producer of coal or other mineral mined in Illinois, is a sale at retail at the place where the coal or other mineral mined in Illinois is extracted from the earth. *This paragraph does not apply to coal or other mineral when it is delivered or shipped by the seller to the purchaser at a point outside Illinois so that the sale is exempt under the Federal Constitution as a sale in interstate or foreign commerce.*

Nothing in this Section shall be construed to authorize a municipality [county, Metro East Mass Transit District or Regional Transportation Authority] to impose a tax upon the privilege of engaging in any business which under the constitution of the United States may not be made the subject of taxation by this State." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 24, par. 8—11—1; see also Ill. Rev. Stat. 1987, ch. 34, par. 409.1; Ill. Rev. Stat. 1987, ch. 111⅔, par. 355.01(b); Ill. Rev. Stat. 1987, ch. 111⅔, par. 704.03(e).)

We do not believe that these provisions bolster the Department's argument. It is clear from the unambiguous language of those provisions that the sale of coal is considered a sale at the site of the mine *only for purposes of determining which local governmental unit may tax the sale*. By their own terms, those provisions do not apply to sales in which the coal is shipped or delivered to the purchaser out-of-state. Consequently, these provisions do not affect our analysis.

Our conclusion that Cora Dock and Central Barge were not acting as the appellees' representatives is further supported by the Department's own interpretation of the regulations as contained in a private letter ruling issued by the Department. (See Private Letter Ruling No. 81—0264, March 5, 1981.) Private letter rulings are informal rulings, opinions or letters issued by the Department in response to an inquiry or request for an opinion regarding the applicability of a tax or an exemption and, pursuant to statute, are required to be published, maintained as a public record, and made available for public inspection and copying. (See, *e.g.*, Ill. Rev. Stat. 1987, ch. 120, pars. 439.3, 441, 2017.) Although the private letter ruling in question has not been made part of the record, we take judicial notice of it as it constitutes a public record. (See *In re W.S.* (1980), 81 Ill. 2d 252, 256-57 (courts may take judicial notice of public records); see also *People v. Pollution Control Board* (1984), 103 Ill. 2d 441, 447.) Private Letter Ruling No. 81—0264 specifically deals with the shipment of coal in interstate commerce and provides in part:

"SUBJECT FILE: COAL INTERSTATE COMMERCE

* * *

*** [A seller is] considered to be making an exempt interstate commerce shipment to the purchaser where [the seller] deliver[s] the goods at a point in Illinois to an independent common or contract carrier for delivery at a

point outside Illinois to the purchaser if [the seller] pay[s] the carrier for its transportation charge (even if [the seller is] later reimbursed by the purchaser), or if [the seller is] shown on the waybill or bill of lading as the shipper. [A seller is] considered to be the shipper to the out-of-State destination, with the purchaser first receiving the physical possession of the property outside Illinois, if [the seller is] shown as the consignor or shipper on the bill of lading even if the purchaser contracted with the carrier for the transportation service and pays the carrier directly. The purchaser is deemed to be receiving the physical possession of the property in Illinois even when the property is transported out of Illinois by a carrier to the purchaser in another state if the purchaser hires and pays the carrier direct *and* is shown on the shipping document as the consignor or shipper as well as being the consignee.

The fact that the transaction is FOB at some point in Illinois will not alter the taxability of the transaction." (Emphasis added.) (Department of Revenue, Private Letter Ruling 81—0264, March 5, 1981.)

Based upon this letter ruling, the facts upon which the Department places so much emphasis, namely, that the coal was shipped to a f.o.b. point in Illinois and that the purchasers contracted with and/or paid for the carriers, are immaterial to the taxability of the shipments since the purchasers were not shown to be shippers or consignors on the shipping documents. Consequently, under the standards enunciated in the private letter ruling, the transactions in the present case would not be taxable.

We recognize that normally private letter rulings have no precedential effect. (See *Citizens Utility Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 217.) However, we also note that whenever private letter rulings contain any policy of general applicability, the Department is required, by statute, to adopt such policy as a rule. (See Ill. Rev. Stat. 1987, ch. 120, pars. 493.3, 441.) The above cited letter ruling clearly contains a pol-

icy of general applicability; the letter ruling is further significant because it reflects the policy which was in effect during the time period at issue in the Union Electric case. Thus, while we do not view the private letter ruling as precedent, we find it instructive as it evidences the Department's stated construction of the regulations.

The *Complete Auto* test (see *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 279, 51 L. Ed. 2d 326, 331, 97 S. Ct. 1076, 1079), discussed by the appellate court, becomes relevant only when there has been a determination that the transaction is taxable by the State. In light of our finding that the transactions were not taxable under the Use Tax Act or the ROTA, there is no need to consider the question of whether taxation of the coal purchases contravenes the provisions of the commerce clause. For the reasons stated above, the judgments of the appellate court are affirmed.

*Judgments affirmed.*