SQUARE D COMPANY, Plaintiff-Appellant and Cross-Appellee, v. J. THOMAS JOHNSON, Director, The Department of Revenue, *et al.*, Defendants-Appellees and Cross-Appellants.

First District (2nd Division) No. 1—91—2381

Opinion filed August 25, 1992.

1072

Martin, Craig, Chester & Sonnenschein, of Chicago (Thomas H. Donohoe and Daniel J. Slattery, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Alison E. O'Hara, Assistant Attorney General, of Chicago, of counsel), for appellees.

· JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Square D Company (Square D) paid under protest Illinois State, Regional Transportation Authority (RTA), and Village of Palatine municipal use taxes imposed on its corporate jet by defendant Illinois Department of Revenue (Department). (Ill. Rev. Stat. 1985, ch. 120, par. 439.3; Ill. Rev. Stat. 1985, ch. 24, par. 8—11—6.) Thereafter, Square D sought an injunction in the circuit court for a refund of the use taxes and interest. On cross-motions for summary judgment, the circuit court granted the Department's motion, finding that the State use tax and the RTA use tax were correctly assessed against Square D; the court further granted Square D's motion for summary judgment with respect to Palatine's municipal use tax. Square D appeals the court's decision upholding the State and RTA use taxes, contending that (1) the Use Tax Act must be construed using a commerce clause analysis prevailing in 1955, when the Illinois Use Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 439.1 *et seq.*) was enacted; (2) the 1967 amendment to the Use Tax Act creating an exemption for interstate carriers for hire violates the constitutional requirement for uniform classifications; (3) the circuit court improperly imposed the RTA use tax on an aircraft registered in Michigan to a Michigan corporation; and (4) the statute of limitations applies to preclude tax liability where Square D made installment payments on the purchase price of the aircraft more than three years before the Department issued a notice of tax liability. The Department cross-appeals the court's reversal of the imposition of the municipal use tax, contending that the court improperly refused to impose the municipal use tax.

Square D, a Michigan corporation, manufactures electrical supplies and electronic components. Though its world headquarters are in

Palatine, Illinois, it has manufacturing and distribution facilities in 25 States and several foreign countries.

On December 16, 1980, Square D paid Gulfstream America Corporation in Savannah, Georgia, $100,000 as a deposit towards the purchase of an airplane. On February 10, 1981, Square D contracted with Gulfstream America Corporation for the sale of a "Gulfstream III" jet[1] for $9,917,797.91. The contract provided for a series of payments to be made prior to delivery of the jet. Square D subsequently paid each of the installment payments,[2] and on March 29, 1983, Gulfstream America Corporation presented Square D with the final invoice for the jet and notified Square D that the jet would be ready for delivery as of April 4, 1983.

On April 6, 1983 the jet was delivered to Square D in Savannah, Georgia. At the time of its delivery, Square D insured the jet with an aviation underwriter; the policy was in Square D's name, at its Palatine, Illinois, address, though the jet was registered in Michigan, the State of Square D's incorporation. The policy provided, "[y]ou keep your aircraft principally in ILLINOIS."

Following delivery, Square D flew the jet from Savannah to Van Nuys, California, for outfitting. There, the jet was equipped with radar and navigation devices, it was painted, and furniture was installed. Between March and October 1983, Square D paid in installments the price of the outfitting, totalling $1,934,830.

On October 4, 1983, the outfitting was completed and a Square D employee flew the jet to Las Vegas, Nevada, and back to California for the purpose of inspecting the outfitter's work. Thereafter, the jet was flown to Wisconsin, where a Square D executive boarded for a trip to Square D's plant in Oshkosh, Wisconsin. From Oshkosh, the jet was flown to Charlotte, North Carolina, where the passengers visited another Square D plant. The jet was then flown to Columbia, South Carolina, where Square D executives reviewed a manufacturing process. From Columbia, the jet traveled to Ashville, North Carolina, so that the passengers could attend a meeting concerning Square D's world contractor program. On October 7, 1983, the jet was flown to Midway Airport in Chicago, Illinois. At no time did the jet transport

---

[1] The Gulfstream III is a large twin-engine jet equivalent to a Douglas DC-9; it is capable of nonstop flights from the United States to Europe.

[2] Square D made the following payments on these dates: February 10, 1981— $875,000; May 17, 1982—$2,925,000; November 16, 1982—$2,925,000; and April 7, 1983—$2,884,180.91. Those payments, coupled with the $100,000 down payment and the accrued interest ($208,617) totalled $9,917,797.91

Square D products; rather, the jet was used solely by Square D employees for "business trips"—trips to other company locations, to business meetings, to "potential acquisitions," and to sales calls.

When not in service in interstate travel, the jet was kept in a hangar in Illinois, first at Midway airport and then at Waukegan airport. The flight from Midway to Waukegan, to transfer the jet to a Waukegan hangar, was the jet's only flight beginning and ending in Illinois. For the most part, required service and repairs were performed outside of Illinois.

The Department conducted a tax audit of Square D for the period from January 1983 through June 1985, and on March 2, 1986, it issued Square D a "Notice of Tax Liability" relating to the jet and assessing tax, interest, and penalties in the amount of $1,202,666.18. The amount of liability included State, municipal, and RTA use taxes.

On March 21, 1986, Square D paid that amount under protest and, on the same day, filed a complaint for injunctive relief. The complaint was comprised of four counts: the first count alleged that Square D was not liable for the use taxes because "under the Commerce Clause, Square D's use of the aircraft is not subject to either the Illinois Use Tax, the Municipal Use Tax or the RTA Use Tax"; count II alleged that the statute of limitations applicable to notices of tax liability prevented the taxing of payments made on the aircraft prior to January 1, 1983; count III alleged that Palatine's use tax was inapplicable because the aircraft was not used in Palatine; and the fourth count alleged that the RTA use tax was inapplicable because the aircraft was not titled or registered with an Illinois agency.

On March 21, 1986, the circuit court entered a preliminary injunction temporarily enjoining the Department from depositing the protested tax payment into the State treasury and from otherwise enforcing the notice of tax liability. On January 29, 1988, the court allowed Square D to plead a fifth count, alleging that the Illinois Use Tax Act's "rolling stock" exemption for an interstate carrier for hire was an unreasonable classification, thereby rendering use taxes such as those against Square D illegal and void.

Both parties filed motions for summary judgment supported by documentation. Following a hearing, on April 12, 1991, the circuit court issued its memorandum decision granting the Department's motion for summary judgment with respect to the State and RTA use taxes. Finding the Illinois Use Tax Act clear and unambiguous, the court refused to subject it to a statutory analysis prevailing at the time of its enactment; rather, the court applied current commerce clause principles to determine that the use taxes on the jet, though on

an instrumentality of interstate commerce, were properly assessed because the taxes met the four-part test set forth in *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (before a tax may be imposed upon an instrumentality of interstate commerce, a court must consider whether: (1) the tax is applied to an activity having a substantial nexus with the taxing State; (2) the tax is fairly apportioned; (3) the tax discriminates against interstate commerce; and (4) the tax is fairly related to the services provided by the State). The court further held that the interstate carrier for hire exemption in the Illinois Use Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 439.3(b)) did not violate the constitutional requirement for uniform classification. Moreover, the court found that Square D, as a "resident" of Illinois, was required to register its jet in Illinois and was thus subject to RTA and municipal use taxes. The court entered summary judgment in favor of Square D as to Palatine's use tax, however, finding that because Square D did not "use" the jet in Palatine, it was not subject to the municipal use tax.

I

Square D initially contends that the Illinois Use Tax Act does not apply to its jet because, at the time of the Illinois Use Tax Act's enactment in 1955, Federal constitutional doctrine prohibited the taxing of an instrumentality of interstate commerce[3] which did not have a "taxable moment" in the taxing State. Square D thus argues that the circuit court erred in applying the *Complete Auto* four-part test to determine if the jet could be taxed and contends that, instead, the court should have determined whether the jet had a "taxable moment" in Illinois;[4] Square D asserts that its jet never had a "taxable moment" in Illinois and, thus, is not subject to use taxes.

In order to arrive at the conclusion that Federal constitutional doctrine prevailing in 1955 controls (and thus the "taxable moment" doctrine applies), Square D maintains that the scope of the Illinois

---

[3]Both parties agree that Square D's jet is an instrumentality of interstate commerce.

[4]A historical review of the commerce clause reveals a shift of positions. Originally, the commerce clause prohibited State taxation of interstate commerce; then the clause was construed to permit some taxation, but only if the instrumentality of interstate commerce had a "taxable moment" in the taxing State; at present, to determine the propriety of a tax on interstate commerce, courts apply the four-prong test enunciated in *Complete Auto*, which is arguably easier to meet than the "taxable moment" doctrine.

Use Tax Act's application to instruments of interstate commerce is controlled by two restraints: first, the power which the United States Constitution reserves to the States to tax instrumentalities of interstate commerce, as interpreted by the Supreme Court; and second, the extent to which the Illinois legislature intended to exercise that power.

Relying upon *Illinois Bell Telephone Co. v. Allphin* (1982), 93 Ill. 2d 241, 443 N.E.2d 580, Square D argues that as a matter of statutory construction, the Illinois Use Tax Act as enacted in 1955 was not intended by the legislature to impose a tax on an instrument of interstate commerce like its jet. In *Illinois Bell*, the supreme court addressed whether the Messages Tax Act (Ill. Rev. Stat. 1983, ch. 120, par. 467.2) as written imposed a tax on revenues from the transmissions of interstate messages. Finding that the Messages Tax Act was ambiguous,[5] the court analyzed the Act pursuant to the law prevailing at the time the Messages Tax Act was adopted. The court opined that, at that time, a State was prohibited by the commerce clause from imposing an occupation tax on interstate commerce. Dismissing the Department of Revenue's argument that the Messages Tax Act was a "flexible type of statute" which taxes interstate service to the extent Federal constitutional law may from time to time permit, the supreme court instead held that "[t]he scope of a statute is fixed by the conditions which exist and the law which prevails at the time the statute is adopted." (*Illinois Bell Telephone Co.*, 93 Ill. 2d at 255.) The court further stated:

> "Some statutes utilize words that clearly envision that their operation and scope are to change with changes in the underlying law without the need for further approval by the legislature. The Messages Tax Act is not such a statute. It does not expressly provide that changes in the constitutional law by judicial decision or constitutional amendment which authorize the General Assembly to do what it previously was restricted from doing should expand the reach of the statute without further legislative action. On the contrary, as we read the statute, the legislature would then have to decide whether it wished to exercise its expanded authority." *Illinois Bell Telephone Co.*, 93 Ill. 2d at 255.

---

[5]The Messages Tax Act provided: "A tax is imposed upon persons engaged in the business of transmitting messages *in this State* ***." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 120, par. 467.2) The *Illinois Bell* court found that the statute was ambiguous as to whether "in this State" modified "persons" or "messages."

Square D urges that *Illinois Bell* is analogous to the instant case. It argues that, like the statute in *Illinois Bell*, the Illinois Use Tax Act is ambiguous as to whether it taxes interstate commerce. Square D asserts that it is unclear whether the governing provision of the Illinois Use Tax Act, "[a] tax is imposed upon the privilege of *using in this State* tangible personal property *** purchased at retail from a retailer" (emphasis added) (Ill. Rev. Stat. 1985, ch. 120, par. 439.3), applies to the use of property in interstate commerce.

Square D also relies upon *People ex rel. Fyfe v. Barnett* (1925), 319 Ill. 403, 150 N.E. 290, where the supreme court considered the meaning of the word "elector" in the context of jury lists. In *Barnett*, the supreme court held that women were prohibited from jury duty because the statute listing the qualifications of those on jury lists required potential jurors to be "electors." In 1874, when the statute proscribing the composition of the jury pool was adopted, "electors" meant men only, as suffrage had yet to be given to women. By 1926, following the passage of the nineteenth amendment, "electors" unquestionably meant both men and women. Nevertheless, the court, in determining the meaning of "elector," looked to constitutional doctrines which prevailed at the time of the passage of the statute at issue, finding that "[t]he words of a statute must be taken in the sense in which they were understood at the time the statute was enacted." *Barnett*, 319 Ill. at 409.

Square D argues, thus, that this court may, like the *Illinois Bell* and *Barnett* courts, look to prevailing Federal constitutional law at the time of the Illinois Use Tax Act's adoption in determining whether its jet should be taxed. Because, at the time of the enactment of the Illinois Use Tax Act, the Federal "taxable moment" doctrine controlled in a commerce clause challenge, Square D maintains that this court should apply that doctrine.

The Department, on the contrary, asserts that the Use Tax Act is clear and unambiguous and, thus, there is no need to otherwise construe or interpret the Illinois Use Tax Act. The Department further contends that *Illinois Bell* is inapplicable to the instant case because in *Illinois Bell*, the court was presented with an ambiguity which raised the question of whether that statute sought to tax an interstate activity, whereas here, the Illinois Use Tax Act "clearly seeks to tax the interstate transaction of buying property in another State which is used in the State of Illinois" or which is used in interstate commerce.

The Department also asserts that *Illinois Bell* is distinguishable because the applicable statute there provided that the messages "tax

is not imposed on the privilege of engaging in any business in interstate commerce or otherwise to the extent to which such business may not, under the Constitution and statutes of the United States, be made the subject of taxation by this State."[6] The Department argues that the *Illinois Bell* court thus had to consider commerce clause law; however, because that language is absent in the Illinois Use Tax Act, the Department maintains that the Illinois Use Tax Act is not limited "by the applicability of *** Commerce Clause principles."

To support its position that current Federal constitutional principles control the interpretation of the commerce clause, the Department relies upon *Archer Daniels Midland Co. v. Department of Revenue* (1988), 170 Ill. App. 3d 1014, 524 N.E.2d 1010. In that case, three aircraft were purchased in a State other than Illinois by a Delaware business with headquarters in Illinois and used in interstate commerce prior to entering Illinois. Following their entrance into Illinois, the aircraft were kept in a hangar in Illinois. Nevertheless, the *Archer Daniels* court found that the out-of-State business was required to pay use taxes on its aircraft used in interstate commerce. In so finding, the court reasoned that the applicable commerce clause analysis was the four-prong test of *Complete Auto* and not the "taxable moment" test.

Though the facts of *Archer Daniels* are squarely on point with those of the case *sub judice*, Square D asserts that that case is not controlling. Specifically, Square D contends that *Archer Daniels* is not dispositive because that court was never called upon to construe the Illinois Use Tax Act. Rather, Square D maintains that the parties in that case presented a commerce clause challenge, but did not raise the issue of statutory construction as Square D has done in the instant case.

■ On the contrary, we find it implicit in the *Archer Daniels* decision that that court read the Illinois Use Tax Act, found it to be unambiguous, and thus applied the *Complete Auto* four-prong test. We further find that Square D's contention in the instant case is merely a commerce clause challenge like that presented in *Archer Daniels* and that *Illinois Bell* is inapposite. Though we recognize that the court in *Illinois Bell* applied commerce clause principles existing at the time of

---

[6]The Civil Administrative Code has recently been amended so that statutes containing this language "shall be construed to preclude taxation of only businesses not subject to taxation *under the latest interpretation* of the United States Constitution and statutes of the United States." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 127, par. 39c—2.

the enactment of the statute at issue, the *Illinois Bell* court was presented with the question of whether that statute even intended to tax an interstate activity; because of that ambiguity, it was necessary for the court to construe the legislative intent. Here, however, no such ambiguity exists.

A commerce clause analysis, applying either the "taxable moment" doctrine or the *Complete Auto* test, becomes relevant only when there has been a determination that the transaction is taxable by the State. (See *Union Electric Co. v. Department of Revenue* (1990), 136 Ill. 2d 385, 556 N.E.2d 236.) In the instant case, we find that the statute, as written, unambiguously intends to tax all property purchased from an out-of-State retailer for use in Illinois, even if that property is also used in interstate commerce. Finding that the Illinois Use Tax Act applies to the instant jet, we must then look to commerce clause principles to determine if imposing the use taxes on the jet violates those principles. Because, however, the statute is neither ambiguous nor unclear, we need not in any manner construe or interpret legislative intent. Accordingly, like the *Archer Daniels* court, we must apply current commerce clause principles to the instant case.

■■ ■ *Complete Auto* provides that before a tax may be imposed upon an instrumentality of interstate commerce, a court must consider whether: (1) the tax is applied to an activity having a substantial nexus with the taxing State; (2) the tax is fairly apportioned; (3) the tax discriminates against interstate commerce; and (4) the tax is fairly related to the services provided by the State. (*Complete Auto*, 430 U.S. at 279, 51 L. Ed. 2d at 331, 97 S. Ct. at 1079.) In the case *sub judice*, Square D clearly has a substantial nexus with Illinois, inasmuch as its world headquarters are located in Illinois and its jet is kept in a hangar in Illinois. Further, we find that the use tax is fairly apportioned in that it exempts property where a sales or use tax has been paid in another State (because Square D has paid no tax whatsoever on the jet, Illinois use tax applies). (Ill. Rev. Stat. 1985, ch. 120, par. 439.3(d); *Archer Daniels*, 170 Ill. App. 3d at 1022-23.) Likewise, we find that the use tax does not discriminate against interstate commerce because the tax rate is the same for both sale and use taxes. Finally, we find that, like the plaintiff in *Archer Daniels*, Square D enjoys the "protection of Illinois laws, access to its legal system, and innumerable other services," and thus is properly subject to taxation in this State.

Because we find that the jet is subject to use taxes pursuant to *Complete Auto*, we need not address Square D's assertion that the "taxable moment" doctrine as applied in *Sundstrand Corp. v. Depart-*

*ment of Revenue* (1975), 34 Ill. App. 3d 694, 339 N.E.2d 351, *Master Craft Engineering, Inc. v. Department of Treasury* (1985), 141 Mich. App. 56, 366 N.W.2d 235, *Consolidation Coal Co. v. Porterfield* (1971), 25 Ohio St. 2d 154, 267 N.E.2d 304, and *W.R. Grace & Co. v. Comptroller of the Treasury* (1969), 255 Md. 550, 258 A.2d 740, precludes taxation of the jet.

## II

Square D next contends that the 1967 amendment to the Illinois Use Tax Act which limited the "rolling stock" exemption to carriers for hire violates the Illinois constitutional requirement for uniformity in taxation. Accordingly, Square D urges this court to strike that portion of the rolling stock exemption which restricts the exemption to interstate carriers for hire.[7]

The Illinois Constitution provides that classes of nonproperty taxes must be reasonable and the subjects or objects within each class must be taxed uniformly. (Ill. Const. 1970, art. IX, §2.) In order to determine whether the rolling stock exemption meets the requirements of uniformity, a two-part test must be satisfied: (1) whether any real and substantial differences exist between those who are taxed and those who are not, and (2) whether the classification is reasonably related to a legislative purpose. *Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, 512 N.E.2d 1240; *Federated Distributors, Inc. v. Johnson* (1988), 125 Ill. 2d 1, 530 N.E.2d 501.

██ In the instant case, the circuit court determined that the provision that the use tax is not applicable to "the use, in this State, of tangible personal property by an interstate carrier for hire as rolling stock moving in interstate commerce" (Ill. Rev. Stat. 1985, ch. 120, par. 439.3(b)) was based on a real and substantial difference between private carriers and carriers for hire. In so holding, the circuit court relied upon *Doolin v. Korshak* (1968), 39 Ill. 2d 521, 236 N.E.2d 897.

In *Doolin,* the supreme court found that the leasing tax act's distinction between having goods delivered by vehicles leased by the seller of those goods (not exempted from tax) and having them delivered by vehicles leased by a public carrier (exempted from tax) did

---

[7]The Department's contention that, even if the exemption were found to be unconstitutional, the severability clause would operate to strike the entire rolling stock exemption and Square D would still be liable for tax, misinterprets Square D's argument. Square D does not maintain that the entire exemption for rolling stock must be stricken; rather, it contends that only the clause restricting the exemption to "for hire" carriers should be stricken, leaving the exemption intact for all "rolling stock."

not violate constitutional principles. The court reasoned that the purpose of the leasing tax act, identical to that of the Illinois Use Tax Act, was "[t]o prevent actual or likely multistate taxation." (39 Ill. 2d at 528.) Finding that a carrier for hire was more likely to encounter multistate taxation, the court upheld the classification, finding that it was reasonably related to the intent of the legislature.

Square D insists that *Doolin* is no longer good law because the *Doolin* court relied upon the old standard for judging uniformity challenges (the burden was on the party attacking the legislation to negate every conceivable basis supporting it), and thus argues that the circuit court here erred in relying upon it, contending instead that the court should have relied upon *Searle* (117 Ill. 2d 454, 512 N.E.2d 1240). In *Searle*, the court rejected the burden relied upon in *Doolin*, instead holding that the appropriate test to determine whether the uniformity requirement is met is the two-part test referred to earlier. *Searle*, 117 Ill. 2d at 468.

Square D points to several cases applying the *Searle* two-part test (*National Pride of Chicago, Inc. v. City of Chicago* (1990), 206 Ill. App. 3d 1090, 562 N.E.2d 563 (classification between automated car wash operated by owner and coin-operated self-service car wash unconstitutional because no difference between classes); *Satellink of Chicago, Inc. v. City of Chicago* (1988), 168 Ill. App. 3d 689, 523 N.E.2d 13 (classification between franchised cable television and subscription television illusory because no difference in the activities of both); however, none of the cases address the classification between the rolling stock of private carriers and carriers for hire.

The only case addressing the private/for hire classification is *Doolin*. Despite the fact that the *Doolin* court applied the now-unacceptable burden, its reasoning is still sound. Its determination that the distinction between carriers for hire and private carriers appropriately addressed the legislative intent is still persuasive. As the *Doolin* court stated, and as the Department now argues, there are differences between carriers for hire and private carriers. Contrary to Square D's argument that both private carriers and carriers for hire perform the same activity, carriers for hire carry passengers and goods as a profit-generating activity, whereas private carriers, though most likely to facilitate or increase the profits of their business, do not fly solely to generate a profit. Although all airplanes run basically the same and need similar equipment, the use of those airplanes by carriers for hire and private carriers is significantly different. As the circuit court found, Square D will not be required to tax its passengers, since its passengers pay no charge for flying. A carrier for hire,

on the other hand, has to pay tax on ticket sales; it pays income taxes on the profits earned from those ticket sales; and it pays additional service, licensing, and permit fees in its residence as well as at other locations.

Moreover, the classification is reasonably related to the purpose behind the rolling stock exemption, to "prevent actual or likely multistate taxation." (*Burlington Northern, Inc. v. Department of Revenue* (1975), 32 Ill. App. 3d 166, 172, 336 N.E.2d 170.) Because a carrier for hire is susceptible to greater taxation than a private carrier, the classification is justified.

Accordingly, in applying the test required by *Searle*, we find that the circuit court was correct in determining that the rolling stock exemption did not violate uniformity of taxation.

### III

Square D next contends that the imposition of RTA and municipal use taxes was improper because Square D neither registered nor was required to register its jet in Illinois, conditions precedent, it argues, to imposition of those use taxes. In response, the Department contends that the Municipal and RTA Use Tax Acts contemplate taxation even in the absence of title or registration.

The RTA Use Tax Act and the Municipal Use Tax Act provide for the imposition of use tax on the privilege of using tangible property purchased at retail outside the region and "which is titled or registered with an agency of this State's government." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 704.03(g); see also Ill. Rev. Stat. 1985, ch. 24, par. 8—11—6.) Based on the plain language of these provisions, Square D asserts that RTA and municipal use taxes cannot be imposed on an aircraft not registered in Illinois.

The Department, however, points to additional provisions in the Municipal and RTA Use Tax Acts which state that the use

> "tax must be paid to the State *** before the title or certificate of registration for the property may be issued. The tax or proof of exemption may be transmitted to the Department by way of the State agency with which *** the tangible personal property must be titled or registered if the Department and such State agency or State officer determine that this procedure will expedite the processing of applications for title or registration." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 704.03(g); Ill. Rev. Stat. 1985, ch. 24, par. 8—11—6.)

Arguing that this language is inconsistent with Square D's contention that registration is a condition precedent to the imposition of tax, the

Department asserts that the intent of the legislature was to impose use taxes on property even in the absence of actual title or registration with a State agency.

Nevertheless, Square D insists that any inquiry into whether its jet should be registered is unnecessary, arguing that the statute clearly imposes use taxes only on property *registered* with an agency of Illinois government. We cannot agree.

■■ An absurd result would ensue if the legislature both required a certificate of registration prior to imposition of use tax *and* required payment of use tax before registration was properly completed. (See also Ill. Rev. Stat. 1985, ch. 15½, par. 22.42(1) (a certificate of registration will not be issued to any aircraft until "any [use] tax so imposed has been paid").) Further, were we to follow Square D's reasoning, an owner of aircraft used and operated in Illinois could escape RTA and municipal use taxes merely by failing to register its aircraft in Illinois, an unacceptable effect. We thus hold that the RTA and Municipal Use Tax Acts impose taxes upon property both registered and required to be registered in Illinois.

The Department next argues that Square D was required to register its jet in Illinois and for support, points to language in the Illinois Aeronautics Act which requires the registration of civil aircraft engaged in air navigation in Illinois (with the exception of nonresidents who are lawfully entitled to operate aircraft in the State of their residence and aircraft engaged in commercial flying). (Ill. Rev. Stat. 1985, ch. 15½, pars. 22.42(1), 22.44.) Arguing that the court was correct in finding that Square D was a resident of Illinois for purposes of the Illinois Aeronautics Act, the Department maintains that Square D cannot escape RTA and municipal use taxes merely because it neglected to register its jet, though required to do so.

Square D maintains that, pursuant to the Illinois Aeronautics Act, it is not a resident of Illinois and thus does not have to register its jet in Illinois. It asserts that the circuit court improperly expanded the scope of residency and erroneously found that, though Square D was "domiciled" in Michigan, it was a "resident" of Illinois. In support of its contention that the circuit court erred, Square D relies upon *LeBlanc v. G.D. Searle & Co.* (1988), 178 Ill. App. 3d 236, 533 N.E.2d 41.

The court in *LeBlanc*, in the context of interpreting the "borrowing statute" of our Limitations Act (Ill. Rev. Stat. 1985, ch. 110, par. 13–101 *et seq.*), held that a corporation is considered a resident only of the State in which it is incorporated, and not of all States in which it is licensed to do business or subject to the jurisdiction of the local

courts. (*LeBlanc*, 178 Ill. App. 3d at 239.) Confining its holding to the statute construed, the *LeBlanc* court further held that "a determination of whether a foreign corporation should be deemed a resident of a State where it is doing business must be based upon the *statute* involved and its purpose." *LeBlanc*, 178 Ill. App. 3d at 240.

The Department asserts that, based upon this caveat, the term "resident" must be construed to mean a corporation which does business in Illinois because of the broad purpose of the Illinois Aeronautics Act—to advance the public safety. Furthermore, relying on the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 1—100 *et seq.*) (which it characterizes as "almost identical to the Aeronautics Act"), the Department points to language in that code which states that a corporation will be deemed a resident of the State of Illinois if that corporation's "principal place of business" is in Illinois. See Ill. Rev. Stat. 1989, ch. 95½, par. 1—173.

■ In the instant case, we find that the court was correct in upholding the RTA use tax assessed against Square D. We find that the Illinois Aeronautic Act's purpose—to advance the public interest and safety—necessitates a broad reading of the term "resident" so that the State will be able to uniformly regulate and supervise aircraft used and operated in Illinois. Though Square D is incorporated in Michigan and holds a Michigan registration for its jet, it does not necessarily follow that it is a "nonresident" and thus exempted from registering its jet in Illinois; rather, we find that because Square D has its world headquarters in Illinois and operates its jet out of an Illinois hangar, it is a "resident" of Illinois for purposes of the Illinois Aeronautics Act. Accordingly, we find that the circuit court did not err in holding that, because Square D was required to register its jet in Illinois, it was subject to RTA use taxes.

■ Square D contends, in the alternative, that even if it is a "resident" of Illinois, it is exempt from registration because its jet is engaged in "commercial flying." (See Ill. Rev. Stat. 1985, ch. 15½, pars. 22.42(1), 22.44.) Notwithstanding its assertion, we find that Square D's jet is not engaged in commercial flying because Square D neither sells nor provides paid service on its jet. Rather, Square D's use of the jet is in furtherance of its commercial electronics business and not "commercial flying."

The Department cross-appeals the circuit court's denial of the imposition of Palatine's municipal use tax, contending that the jet, though not kept in a hangar in Palatine and though not flown in Palatine, nonetheless is controlled by officers of Square D operating out of Palatine. Thus, the Department asserts that because the jet is con-

trolled by persons in Palatine, the jet is "used" in Palatine for purposes of the Act.

For support, the Department points to the statutory definition of "use" as "the exercise by any person of any right or power over tangible personal property incident to the ownership of that property." (Ill. Rev. Stat. 1985, ch. 120, par. 439.2.) The Department asserts that the pilots who fly the plane do not exercise a right or power over the jet; rather, the officers of Square D, who control when the jet is flown, actually "use" the jet.

■ The Department's reasoning, however, is strained. Though the statute defines "use" as "any right or power over tangible personal property," the Department's interpretation would extend the definition of "use" to any control over an object; if the Department's reasoning were accepted, a corporation's control over tangible property anywhere in the State would subject that corporation to use tax in the municipality where the corporation is situated, even if the property were hundreds of miles away. A more logical analysis of the "use" of the jet was applied by the circuit court, which determined that the "use" of the jet occurred where the corporate employees or officers "exercised their right or power" over the jet, in other words, where the jet was actually located and where the passengers boarded the jet.

IV

Square D lastly asserts, in the alternative, that the statute of limitations bars the Department's claim to taxes on $6,825,000 of the purchase price of the jet, contending that it had made those payments three years prior to the Department's notice of tax liability. For support, Square D points to the applicable statute of limitations, arguing that it prohibits the Department of Revenue from imposing use taxes more than 3 to 3½ years after the date upon which the tax was due.

The Use Tax Act adopts the limitations contained in section 4 of the Retailers' Occupation Tax Act (see Ill. Rev. Stat. 1985, ch. 120, par. 439.12), which provides that "[e]xcept in case of a fraudulent return, *** no notice of tax liability shall be issued on and after each January 1 and July 1 covering gross receipts received during any month or period of time more than 3 years prior to such January 1 and July 1, respectively." (Ill. Rev. Stat. 1985, ch. 120, par. 443.) Section 5 of the Retailers' Occupation Tax Act further provides that "[e]xcept in case of failure to file a return, *** no notice of tax liability shall be issued on and after each July 1 and January 1 covering gross receipts received during any month or period of time more than

3 years prior to such July 1 and January 1, respectively." Ill. Rev. Stat. 1985, ch. 120, par. 444.

Thus, Square D contends that if any tax liability was incurred before January 1, 1983, on the $6,825,000 in payments made during 1980, 1981, and 1982 those installments would be outside the statute of limitations, because the Department did not attempt to collect taxes on those installment payments until over three years later on March 2, 1986.

■ According to the Illinois Use Tax Act, Square D was required to pay tax directly to the Department if it did not pay tax directly to the manufacturer from which it purchased the jet "as provided in Section 10" of the Illinois Use Tax Act. (Ill. Rev. Stat. 1985, ch. 120, par. 439.3.) Square D was thus, pursuant to section 10, required to file a return with the Department and pay the tax upon those portions of the selling price paid in installments; section 10 provided:

> "Except as to motor vehicles and aircraft, when tangible personal property is purchased from a retailer for use in this State by a purchaser who did not pay the tax imposed by this Act to the retailer ***, such purchaser (by the last day of the month following the calendar month in which such purchaser makes any payment upon the selling price of such property) shall, except as provided in this section, file a return with the Department and pay the tax upon that portion of the selling price so paid by the purchaser during the preceding calendar month. *** Such return and payment from the purchaser shall be submitted to the Department sooner than the last day of the month after the month in which the purchase is made to the extent that that may be necessary in order to secure the title to a motor vehicle or the certificate of registration for an aircraft." (Ill. Rev. Stat. 1985, ch. 120, par. 439.10.)

Thus, even though Square D did not pay the full purchase price, it was required to pay tax on each of the installments no later than the last day of the month following the month in which the installment payment was made.

Square D maintains that the circuit court erred in determining that it was required to report the purchase of the jet to the Department. Instead, Square D asserts that, though retailers are required to file separate returns for selling aircraft, until 1987, purchasers of aircraft from an out-of-State retailer were not required to file a separate

return for that aircraft.[8] Square D argues that the absence of such a provision requiring the filing of a separate return demonstrates that there was no such requirement at the time the tax liability in the instant case arose. Square D contends that it did not "fail" to file a required return and thus the "failure" to file a return (invoked in section 5 of the Retailers' Occupation Tax Act) does not prevent the limitations period from running. Rather, Square D asserts that section 4 of the Retailers' Occupation Tax Act applies.

Though the Department argued in the circuit court that Square D was required to file a "separate transaction return" for the jet, it now also asserts that the limitations period does not apply because the "purpose, to enable the Department to have time to discover unreported purchase transactions, exists both where a tax return was required to have been filed and was not and where one was not required to have been filed." The Department further contends that the amendment to the Illinois Use Tax Act now requiring the filing of a return by purchasers of aircraft from out-of-State retailers merely "clarified" that section 10 of the Illinois Use Tax Act requires the filing of a tax return.

In the instant case, we find that the circuit court was correct in holding that the statute of limitations did not preclude imposition of use taxes. We find that, even prior to 1987, the language of section 10 of the Illinois Use Tax Act required the filing of a separate tax return to report the purchase of aircraft from out-of-State retailers. (Ill. Rev. Stat. 1985, ch. 120, par. 439.10.) We thus find that section 5 of the Retailers' Occupation Tax Act, which specifically applies where a tax return has not been filed, exempts the Department from the running of the statute of limitations. Ill. Rev. Stat. 1985, ch. 120, par. 444.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.

---

[8]Public Act 85—299, effective September 9, 1987, amended the Illinois Use Tax Act to require separate returns for each motor vehicle or aircraft purchased from an out-of-State retailer and used in Illinois.