A.B. DICK COMPANY, as Successor in Interest to A.B. Dick Acceptance Corporation, Plaintiff-Appellant, v. SAM McGRAW, as Acting Director of the Department of Revenue, *et al.*, Defendants-Appellees.

Fourth District   No. 4—96—0057

Argued January 15, 1997.—Opinion filed April 4, 1997.

McCULLOUGH, J., dissenting.

Richard A. Hanson (argued), of McDermott, Will & Emery, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Brian F. Barov (argued), Assistant Attorney General, of counsel), for appellees.

JUSTICE COOK delivered the opinion of the court:

A.B. Dick Company (A.B. Dick) and its wholly owned subsidiaries, A.B. Dick Acceptance Corporation (Acceptance) and Videojet Systems International (Videojet), filed separate Illinois income tax returns for the tax years ending March 31, 1986, 1987, and 1988. During audit, the companies amended their returns and filed a single combined return for each year, alleging the companies were a unitary business group within the meaning of section 1501(a)(27) of the Illinois Income Tax Act (Tax Act) (now 35 ILCS 5/1501(a)(27) (West Supp. 1995)). Under the amended returns, the companies claim they are owed a refund of $1.2 million. The Department of Revenue (Department) concluded that A.B. Dick and Acceptance were parts of a unitary business, but that Videojet was not. As a result of the audit the Department determined that Acceptance owed a deficiency of $2,450. Acceptance paid that amount under protest and filed a verified complaint in the circuit court of Sangamon County pursuant to the State Officers and Employees Money Disposition Act (now 30 ILCS 230/1 through 6a (West 1994)) seeking return of the tax, interest and penalties paid under protest. The circuit court, in a one-paragraph docket entry, ruled in favor of the Department. The taxpayer appeals. We reverse and remand.

■ It is not an easy question what part of a corporation's income should be taxed in a particular state when that corporation does business in several states. The question is even more complicated when the multistate business is carried on by an associated group of corporate entities. See *Citizens Utilities Co. v. Department of Revenue*, 111 Ill. 2d 32, 39, 488 N.E.2d 984, 986 (1986); *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 108, 417 N.E.2d 1343, 1347 (1981). There are constitutional limitations on the power of a state to tax income

arising out of interstate activities. A state has the power to tax out-of-state activities of associated corporations by formula apportionment only when the corporations constitute a "unitary business." *Container Corp. v. Franchise Tax Board*, 463 U.S. 159, 165-67, 77 L. Ed. 2d 545, 553-54, 103 S. Ct. 2933, 2940-41 (1983). The question whether there is a "unitary business" in the present case is one of statutory interpretation, not constitutional power, but the statute employs terms that have been defined in the constitutional cases.

The statute provides, in pertinent part:

> "The term 'unitary business group' means a group of persons related through common ownership whose business activities are integrated with, dependent upon and contribute to each other. *** Unitary business activity can ordinarily be illustrated where the activities of the members are: (1) in the same general line (such as manufacturing, wholesaling, retailing of tangible personal property, insurance, transportation or finance); or (2) are steps in a vertically structured enterprise or process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining, and marketing); and, in either instance, the members are functionally integrated through the exercise of strong centralized management (where, for example, authority over such matters as purchasing, financing, tax compliance, product line, personnel, marketing and capital investment is not left to each member)." 35 ILCS 5/1501(a)(27) (West Supp. 1995).

More than common ownership is required for a unitary business. The fact that a holding company owns controlling interest in several corporations is not enough to make the group a unitary business. *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 440, 63 L. Ed. 2d 510, 523, 100 S. Ct. 1223, 1233 (1980) (unitary business, however, where dividends represent profits derived from a functionally integrated enterprise). There must be something " 'beyond the mere flow of funds arising out of a passive investment or a distinct business operation.' " *Citizens Utilities*, 111 Ill. 2d at 47, 488 N.E.2d at 990, quoting *Container Corp.*, 463 U.S. at 166, 77 L. Ed. 2d at 554, 103 S. Ct. at 2940. There must be more than the type of occasional oversight " 'that any parent gives to an investment in a subsidiary.' " *Container Corp.*, 463 U.S. at 180 n.19, 77 L. Ed. 2d at 563 n.19, 103 S. Ct. at 2948 n.19, quoting *F.W. Woolworth Co. v. Taxation & Revenue Department*, 458 U.S. 354, 369, 73 L. Ed. 2d 819, 831, 102 S. Ct. 3128, 3138 (1982). Section 1501(a)(27) of the Tax Act imposes three requirements: (1) that there be common ownership, (2) that the companies be in the same general line of business, and (3) that there be functional integration through the exercise of strong centralized

management. 35 ILCS 5/1501(a)(27) (West Supp. 1995). Only the third requirement is at issue in this case.

Some cases seem to indicate that "functional integration" refers to the operations of a company and that functional integration is a separate concept from centralized management. *F. W. Woolworth*, 458 U.S. at 364-66, 73 L. Ed. 2d at 828-29, 102 S. Ct. at 3135-36; see also *Mobil*, 445 U.S. at 438, 63 L. Ed. 2d at 521, 100 S. Ct. at 1232 ("contributions to income resulting from functional integration, centralization of management, and economies of scale"). It seems logical that whenever there is functional integration of operations there is also strong centralized management and vice versa. Section 1501(a)(27) of the Tax Act rejects the idea there are two separate tests. If functional integration has been shown, or if strong centralized management has been shown, then there is a unitary business.

## I

A.B. Dick is a Delaware corporation with its principal office in Niles, Illinois. It manufactures and sells a variety of office and business printing and duplicating equipment. Acceptance was a wholly owned subsidiary of A.B. Dick that provided financing for purchasers of A.B. Dick equipment. During the pendency of this appeal, Acceptance was liquidated into A.B. Dick, which succeeded to Acceptance's rights and obligations. Over the course of several years A.B. Dick developed a type of noncontact printing known as ink-jet technology. For a time, this product line, called the "Videojet" line, was manufactured and marketed by A.B. Dick. On January 1, 1985, however, A.B. Dick incorporated Videojet, a wholly owned subsidiary, to which A.B. Dick transferred its Videojet line of assets, including machinery, equipment, materials, supplies and inventory. A.B. Dick also contributed or licensed 41 patents to Videojet. According to A. Harris Walker, the Videojet line was incorporated because the line was growing and they wanted to measure the line's performance; they wanted to more closely monitor what the business was doing.

David Powell is the chairman and president of A.B. Dick. He is also the chairman of Videojet. Henry J. Bode is the vice-president of A.B. Dick and is also the president of Videojet. Bode testified that, prior to Videojet's incorporation in 1985, he had been employed by A.B. Dick since 1972. Videojet's board of directors consists of Powell and Bode. A. Harris Walker, general counsel of A.B. Dick, is the secretary of both companies. Pat Hoffman is the assistant secretary of both companies. Kenneth Levin, the chief financial officer of A.B. Dick, exercised control over Videojet, determining, for example, how much Videojet cash should be transferred to A.B. Dick. There was

testimony that both before and after incorporation Powell, Levin, and Walker managed A.B. Dick and Videojet as if the two were a single company.

*Purchasing.* Videojet had a separate purchasing department, but Videojet's purchase requests for equipment costing more than $500 were reviewed by Levin and approved by Powell. A.B. Dick's general counsel had to approve all Videojet real estate contracts and some contracts for the purchase of personal property.

*Financing.* All Videojet funds not immediately needed for operations were transferred to A.B. Dick as an intercompany loan. Since 1986, those loans bore interest, but that interest was never paid; instead it was treated as a dividend at year end. In March 1988, A.B. Dick provided financing for Videojet's acquisition of the Cheshire Division of Xerox Company through a $12 million interest-free loan. Since 1990, Videojet has occupied a new headquarters and manufacturing facility in Wood Dale, Illinois. The lessor required A.B. Dick to sign the lease, which obligates A.B. Dick to pay rent of $199,000 per month for five years and escalating rent thereafter.

*Tax compliance.* Videojet employed only one tax accountant, who had responsibility for the preparation of state tax returns. Videojet did not have its own tax library. A.B. Dick had authority to approve all federal and state tax returns filed by Videojet. During a 1990 audit of Videojet, the Department dealt only with Videojet's employee, Jerome Jung. When the Department assessed Videojet as owing an additional $213,070, Jung tendered a check in that amount without protest and without seeking the approval of A.B. Dick. A.B. Dick's chief financial officer, Levin, testified that when Videojet was incorporated he had pointed out that unitary tax returns should be filed. Levin testified that unitary returns were not filed because "[m]y tax department blew it and I didn't concentrate on state income taxes, quite frankly."

*Product line.* Both A.B. Dick and Videojet are engaged in the manufacture and sale of office and business printing and equipment, but Videojet's activities are restricted to a line of printing equipment utilizing ink-jet technology. A.B. Dick and Videojet maintained separate research and engineering departments and did not develop any products or patents to be used by the other. (At least not after Videojet's incorporation.) The separate departments met four times a year for "corporate technology updates," although the record does not disclose what subjects were discussed. Videojet used some foreign patents licensed to it by A.B. Dick without paying any royalties.

*Personnel.* Videojet had a separate personnel department, but A.B. Dick controlled all Videojet salary levels. A.B. Dick approval

was required to hire Videojet employees earning more than $40,000 (10% of the Videojet workforce) and for some terminations. A.B. Dick approval was required for all Videojet contracts with dealers or distributors.

Videojet has no legal department. All of Videojet's legal work is done by the A.B. Dick legal department, which spent about 30% of its time on Videojet matters. If Videojet needed outside counsel, A.B. Dick did the hiring. Videojet paid A.B. Dick about $200,000 per year for legal services. A.B. Dick provides all real estate management services to Videojet. Videojet's Wood Dale facility was designed and contracted to be built by the A.B. Dick real estate department. A.B. Dick provides all insurance services to Videojet. A.B. Dick and Videojet were covered by the same insurance policies, for which Videojet paid A.B. Dick $249,000 (1986), $324,000 (1987), and $350,000 (1988). Videojet employees were part of the A.B. Dick retirement plan. A.B. Dick's employment benefits manager supervised that plan and spent about 10% of his time on Videojet matters.

A.B. Dick's director of corporate accounting spent about 5% of his time on Videojet matters. A.B. Dick's tax manager spent 5% to 8%. A.B. Dick's chief financial officer spent 5% to 10%.

*Marketing.* A.B. Dick and Videojet had separate sales and marketing departments, although Videojet's sales personnel shared offices, support facilities, secretarial and other services with A.B. Dick sales personnel at eight A.B. Dick offices in the United States. A.B. Dick is reimbursed its cost for the offices. Videojet had two other sales offices it did not share with A.B. Dick. The A.B. Dick and Videojet sales departments did not employ common marketing or advertising programs. They did not share a common trademark or other marketing symbol. They did not sell each other's products. A.B. Dick controlled all decisions regarding introduction of new Videojet products and pricing of all Videojet products. There were no intercompany sales or common purchasing of raw materials or supplies. Contracts with dealers or distributors to sell Videojet products required A.B. Dick approval. A.B. Dick's distributors in the United Kingdom and Canada were also Videojet's distributors.

*Capital investment.* A.B. Dick decided how much cash would remain in Videojet. Before Videojet moved into the Wood Dale facility, A.B. Dick subleased a manufacturing and office facility located in Elk Grove, Illinois, to Videojet, at cost. A.B. Dick occupied a 924,000-square-foot facility in Niles, Illinois, which it leased to Videojet at cost. Levin testified the rent was determined the same way as when Videojet was a division, actual cost with no profit built in.

The Department argues that the financial oversight that A.B.

Dick exercised over Videojet is the normal financial relationship between a parent and a subsidiary corporation. *Cf. F.W. Woolworth*, 458 U.S. at 369, 73 L. Ed. 2d at 831, 102 S. Ct. at 3138 (type of occasional oversight "that any parent gives to an *investment* in a subsidiary" (emphasis added)). The Department notes that Videojet charged A.B. Dick interest on the intercompany loan. The Department would ignore the $12 million interest-free loan to Videojet because it was made at the very end of the tax years in question. The Department argues that Jung's action refutes A.B. Dick's assertion that it maintained strict oversight of Videojet's accounting matters and tax expenditures, and argues that potential authority over tax matters is not enough. The Department argues the circuit court may have made credibility determinations adverse to A.B. Dick. The Department also argues that the circuit court could have rejected some testimony of A.B. Dick officials as self-serving.

The Department notes there was only one transfer of personnel between the two companies, a Videojet employee who was transferred to A.B. Dick. The Department concedes there were some managerial links between the two companies, but argues there was no proof "that these managerial links were so substantial that they provided significant sharing of values or economies of scale for A.B. Dick and Videojet." The Department indicates that Videojet paid A.B. Dick for everything it got from A.B. Dick. The Department argues that neither personal management style nor subjective intent is a relevant criterion for determining whether there is centralized management. The Department argues that A.B. Dick and Videojet acted separately and autonomously in marketing and selling their products, that there was no common marketing, advertising, research or sales. There were no intercompany sales. Videojet and A.B. Dick technicians are not cross-trained to repair and maintain each other's products (except in Canada). The Department argues that it takes more than potential authority over pricing decisions to show unity.

## II

■ The question whether a taxpayer participated in a unitary business is a question of fact. *Citizens Utilities*, 111 Ill. 2d at 47, 488 N.E.2d at 990. In cases where the evidence is close, where findings of fact must be determined from the credibility of the witnesses, a court of review will defer to the circuit court's factual findings unless they are against the manifest weight of the evidence. *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433, 581 N.E.2d 656, 660 (1991). The evidence here was presented through a 29-page stipulation of facts accompanied by exhibits, and A.B. Dick presented the testimony of

Bode, Levin, and Walker. The Department did not present any evidence. We would defer to any findings of fact in this case, but for the most part the facts are undisputed. See *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271, 664 N.E.2d 52, 56 (1996) (where facts are undisputed, question is one of law); *Kroger Co. v. Department of Revenue*, 284 Ill. App. 3d 473, 482, 673 N.E.2d 710, 715 (1996).

In the circuit court, the Department argued that centralized management requires not only the involvement of one or more officers in the operations of all the members of the group, but also centralized units that perform important operational functions for all group members. A.B. Dick suggests that argument adds something to the statutory requirement that there be "[functional integration] through the exercise of strong centralized management" (35 ILCS 5/1501(a)(27) (West Supp. 1995)) and that the Department has abandoned the argument in this court. The construction of a statute is a question of law to be independently decided by the reviewing court. *Village of Glenview v. Ramaker*, 282 Ill. App. 3d 368, 370, 668 N.E.2d 106, 108 (1996).

There are problems where the local entity appears profitable but the claim is made that its tax should be reduced because of losses by other corporations in other states. Those losses may be difficult to verify and Illinois may be required to depend on the cooperation of the other states, which may not always be forthcoming. See *Moorman Manufacturing Co. v. Bair*, 437 U.S. 267, 57 L. Ed. 2d 197, 98 S. Ct. 2340 (1978) (upholding Iowa single-factor (sales) formula). Nevertheless, combined reporting is not an aberration; it is a necessary tool to prevent the triumph of corporate formality over economic reality. *Citizens Utilities*, 111 Ill. 2d at 40, 488 N.E.2d at 987. Combined reporting is often advantageous to the taxing body. In all the cases cited in this opinion, the taxing body took the position that the business was a unitary business. The taxing body was successful in all those cases except *F.W. Woolworth*. Illinois has recently (effective April 25, 1996) rejoined the multistate tax compact, as an associate member. Neither the Department nor the taxpayer has a choice whether combined returns are filed. If the business is unitary, combined reporting is required. It is important that rules be developed to establish what is and what is not a unitary business. The purpose of section 1501(a)(27) of the Tax Act, as explained in Governor Thompson's message accompanying the amendatory veto that created the section, was to "provide the certainty and the stability so important to businesses, particularly those considering expanding within or into Illinois." III Senate Journal, 82d Ill. Gen. Assem.

(November 19, 1982), at 3756 (1982 Sess.) (Governor's recommendations to House Bill 2588).

### III

The circuit court in the present case made the following docket entry:

> "Section 1501(a)(27) reads that *both elements of strong centralized management, i.e.[,] strong central management authority and the exercise of that authority through centralized operations[,] must be present in order for persons to be [a] unitary business group.* The Court finds that there is a lack of fundamental [*sic*] integration in the key areas of manufacturing, marketing, engineering, purchasing, advertising and distribution, demonstrating that there was not a single unitary business in this case." (Emphasis added.)

The emphasized language comes from the Department's regulation 100.9700(g) (86 Ill. Adm. Code § 100.9700(g) (1996); *cf.* regulation 100.3010(c)(1)(C) (86 Ill. Adm. Code § 100.3010(c)(1)(C) (1996)), which explains that both elements "must exist in order to justify a conclusion that the operations of otherwise seemingly separate trades or businesses are significantly integrated so as to constitute a unitary business." The regulation does not require that "both elements" or "centralized operations" be shown to exist in every case, only in those cases where seemingly separate businesses are involved. *Citizens Utilities*, 111 Ill. 2d at 50-51, 488 N.E.2d at 992. In any event, this language was contained in the regulations before section 1501(a)(27) of the Tax Act was enacted. See Illinois Tax Rep. (CCH) ¶12—416, at 1304 (1982) (regulation 300—2(c)(1)(C)). The failure to incorporate this language into section 1501(a)(27) of the Tax Act, when the rest of section 1501(a)(27) was taken from the regulation, casts doubt on the continuing validity of the language.

Section 1501(a)(27) of the Tax Act gives, as an example of strong centralized management, the situation where "authority" over various activities "is not left to each member." 35 ILCS 5/1501(a)(27) (West Supp. 1995). That language does not suggest that any great deal of activity on the part of the parent is necessary to show an exercise of authority, let alone the exercise of that authority through centralized operations. Certainly it is not enough that authority simply exists. Even a holding company that has a mere "passive investment" in a subsidiary will have ultimate authority over that subsidiary. On the other hand, the day-to-day management of the subsidiary need not be controlled by the parent. *Citizens Utilities*, 111 Ill. 2d at 48, 488 N.E.2d at 990. What is required is that "the parent corporation enjoyed actual, centralized control" over the group. *Citizens Utilities*, 111 Ill. 2d at 51, 488 N.E.2d at 992.

There appears to be as much in the way of centralized management in this case as there was in *Citizens Utilities*, where the parent owned 24 utility subsidiaries, each of which operated in a different state. In *Citizens Utilities*, there were interlocking directors, the same officers (for 24 separate companies), the parent had to approve some purchases, and the parent provided some engineering, legal, and accounting services, at cost. *Citizens Utilities*, 111 Ill. 2d at 48, 488 N.E.2d at 990; see also *Container Corp.*, 463 U.S. at 166, 77 L. Ed. 2d at 554, 103 S. Ct. at 2941 (unitary principle can be applied to series of similar enterprises operating separately but linked by common managerial *or* operational resources).

The Department argues there has been no showing of a significant flow of value between the two companies or the creation of economies of scale through centralized management functions. We agree the flow of value must be significant, that it must be more than *de minimis,* but we disagree that exact proof of value is required. The justification for combined reporting is that there are "many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise." *Container Corp.*, 463 U.S. at 164-65, 77 L. Ed. 2d at 553, 103 S. Ct. at 2940; *Citizens Utilities*, 111 Ill. 2d at 49, 488 N.E.2d at 991 (using headquarters staff to provide services for all group members results in economies of scale). It would be impossible to provide exact proof of "largely unquantifiable transfers of value."

The Department argues this case is similar to *F.W. Woolworth*, where the finding of unitary business was held to violate the due process clause. Woolworth, a retailer, owned all the stock of three foreign subsidiaries, also retailers, and elected all their directors. "It potentially has the authority to operate these companies as integrated divisions of a single unitary business," but mere potential was not enough when the facts showed the subsidiaries to be discrete business enterprises. *F.W. Woolworth*, 458 U.S. at 362, 73 L. Ed. 2d at 826, 102 S. Ct. at 3134. "*[N]o* phase of any subsidiary's business was integrated with the parent's." (Emphasis in original.) *F.W. Woolworth*, 458 U.S. at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135. Woolworth's operations were not functionally integrated with those of its subsidiaries, and there was no centralization of management or achievement of other economies of scale. Each subsidiary operated as a distinct business enterprise at the level of full-time management, none of the subsidiaries' officers were current or former employees of the parent, and only one officer of a subsidiary was a participant in Woolworth's profit-sharing plan. *F.W. Woolworth*, 458 U.S. at 366 n.15, 73 L. Ed. 2d at 829 n.15, 102 S. Ct. at 3136 n.15. Woolworth did

not provide many essential corporate services for the subsidiaries. There was a notable absence of any umbrella of centralized management and controlled interaction. *F.W. Woolworth*, 458 U.S. at 371, 73 L. Ed. 2d at 832, 102 S. Ct. at 3138-39. The dissent noted there was frequent communication between upper levels of management, major financial decisions had to be approved by the parent, and Woolworth's published financial reports were prepared on a consolidated basis. *F.W. Woolworth*, 458 U.S. at 373-74, 73 L. Ed. 2d at 833-34, 102 S. Ct. at 3140 (O'Connor, J., dissenting, joined by Blackmun and Rehnquist, JJ.).

In *Container Corp.*, the parent manufactured custom-ordered paperboard packaging and controlled 20 foreign subsidiaries engaged in essentially the same business. The parent maintained a relatively hands-off attitude with the subsidiaries, but held or guaranteed about half of the subsidiaries' debt, provided advice and consultation in a number of areas, and occasionally assisted the subsidiaries with purchases, either by selling them used equipment or by employing its own purchasing department to act as agent for the subsidiaries. The Supreme Court upheld the finding of a unitary business, relying especially on the loans and loan guarantees and on the managerial role played by appellant. This was not the " 'type of occasional oversight—with respect to capital structure, major debt, and dividends—that any parent gives to an investment in a subsidiary.' " *Container Corp.*, 463 U.S. at 180 n.19, 77 L. Ed. 2d at 563 n.19, 103 S. Ct. at 2948 n.19, quoting *F.W. Woolworth*, 458 U.S. at 369, 73 L. Ed. 2d at 831, 102 S. Ct. at 3138. Instead, the managerial role was grounded in Container Corporation's own expertise and its overall operational strategy—"precisely the sort of operational role we found lacking in *F.W. Woolworth*." *Container Corp.*, 463 U.S. at 180 n.19, 77 L. Ed. 2d at 563 n.19, 103 S. Ct. at 2948 n.19.

## IV

■ Is Videojet a mere "passive investment," to which A.B. Dick gives only occasional oversight, or is there functional integration of operations and strong centralized management? *Citizens Utilities* saw it as significant that officers of the parent were actively involved as officers of the subsidiaries. *Citizens Utilities*, 111 Ill. 2d at 51, 488 N.E.2d at 992. We have that in this case with Bode, Walker, and Hoffman. F.W. Woolworth complained that none of the subsidiary's officers were current or former employees of the parent. The president of Videojet, Bode, was employed by A.B. Dick for over 10 years before Videojet's incorporation. Although the Department argues there was only one transfer of personnel between the two companies,

in fact all employees of Videojet at the time of its incorporation had been employees of A.B. Dick. There was much more in this case than the personal management style of one or two individuals.

Assuming that centralized operations are required, they were present here. In *F.W. Woolworth*, the complaint was made that *"no phase of any subsidiary's business was integrated with the parent's."* (Emphasis in original.) *F.W. Woolworth*, 458 U.S. at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135. Videojet had some separate departments, but it had no legal department, no real estate department, and no insurance department. Videojet relied on A.B. Dick for all those services. In other areas such as purchasing, accounting, personnel, and marketing, there was either assistance or oversight. *F.W. Woolworth* noted that only one officer of a subsidiary was a participant in the Woolworth profit-sharing plan. *F.W. Woolworth*, 458 U.S. at 366 n.15, 73 L. Ed. 2d at 829 n.15, 102 S. Ct. at 3136 n.15. All Videojet employees are part of the A.B. Dick retirement plan. A.B. Dick and Videojet are covered by the same insurance policies. It is true that Videojet reimburses A.B. Dick for its share of those policies and, accordingly, A.B. Dick cannot be considered to have made any capital investment in Videojet through those policies, but A.B. Dick certainly provided essential corporate services by evaluating and obtaining the policies.

*Container Corp.* considered the parent's loans and loan guarantees to be significant. In the present case Videojet's credit needs were met by A.B. Dick, which signed leases for Videojet, subleased other property to Videojet, and financed an acquisition by Videojet through a $12 million interest-free loan. The Department argues the loan was made at the end of the tax years in question and should be ignored. The loan does show the relationship between the companies, however, and should be considered in the absence of any evidence the loan was improperly designed to evidence unitary operation. The combined returns were not filed until 1990, long after the loan in March 1988.

We find it persuasive that A.B. Dick did not acquire Videojet from another company, but developed it from within. It is reasonable to presume that corporations engaged in the same line of business are unitary. *Container Corp.*, 463 U.S. at 178, 77 L. Ed. 2d at 561, 103 S. Ct. at 2947. It seems even more likely that a corporation developed as a part of a parent's business is not a mere passive investment but is well-equipped to make use "of the parent's existing business-related resources." *Container Corp.*, 463 U.S. at 178, 77 L. Ed. 2d at 561, 103 S. Ct. at 2947.

Even assuming there were significant disputed facts here, the circuit court's decision was clearly contrary to the manifest weight of the evidence. A judgment is against the manifest weight of the evi-

dence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based upon the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242, 665 N.E.2d 1260, 1274 (1996). Accordingly, we reverse the decision of the circuit court and remand with instructions that the circuit court enter an order granting the relief sought.

Reversed and remanded.

GARMAN, J., concurs.

JUSTICE McCULLOUGH, dissenting:
I respectfully disagree with the decision of the majority.

As the majority states, section 1501(a)(27) of the Tax Act sets forth three requirements for determination of a unitary business and only the element of functional integration through the exercise of strong centralized management is at issue.

The circuit court found that there was "a lack of fundamental integration in the key areas of manufacturing, marketing, engineering, purchasing, advertising and distribution."

The majority agrees that there were significant disputed facts. The circuit court's decision was not clearly contrary to the manifest weight of the evidence.