BORDEN, INC., Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—96—2408

Opinion filed March 27, 1998.

Fred O. Marcus, James H. Ryan, and Jordan M. Goodman, all of Horwood, Marcus & Berk, Chartered, of Chicago, for appellant.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Cacilia Reich Masover, Assistant Attorney General, of counsel), for appellees.

JUSTICE HOURIHANE delivered the opinion of the court:

Plaintiff, Borden, Inc. (Borden), appeals an order of the circuit court affirming a decision of the Director of the Illinois Department of

Revenue (Director). The Director found that, for purposes of the Illinois Income Tax Act (Tax Act) (Ill. Rev. Stat. 1981, ch. 120, par. 1—101 *et seq.* (now 35 ILCS 5/101 *et seq.* (West 1996))), Borden's three Pepsi-Cola subsidiaries (Pepsi Subs) were part of Borden's "unitary business group" and the capital gains Borden realized from the sale of its Pepsi Subs stock in 1982 were "business income." We affirm.

## BACKGROUND

Borden, a New Jersey corporation with its principal place of business in New York, is engaged in the manufacture and marketing of food, consumer, and chemical products and in the provision of related services. Borden operates in various states, including Illinois. In 1971, Borden acquired the Pepsi Subs as wholly owned subsidiaries.[1] The Pepsi Subs are independent bottlers that operate within designated geographical areas under exclusive bottling and syrup appointments with Pepsi-Cola Corporation (Pepsi), a Delaware corporation. The bottling and syrup appointments prohibit the Pepsi Subs from distributing any other "cola" and require the Pepsi Subs' participation in various advertising and promotional programs.

In January 1982, Borden sold the Pepsi Subs stock and realized a long-term capital gain in excess of $27 million. During the course of a subsequent tax audit, Borden advised the Department that Borden had incorrectly included the capital gain in its business income, rather than in its nonbusiness income, and filed a valid claim for refund. Following the audit, Borden filed a protest and hearing request, contesting the Department's determination that, for each of tax years 1981 and 1982, Borden and the Pepsi Subs were engaged in a unitary business operation and that the gain realized by Borden on the sale of the Pepsi Subs stock was business income.

The administrative law judge (ALJ) found that Borden and the Pepsi Subs were not engaged in a unitary business and that the gain on the sale of the stock was business income. The Director rejected the recommended decision of the ALJ that Borden and the Pepsi Subs did not conduct a unitary business, but concurred with the ALJ as to the inclusion of the capital gain as business income. Borden subsequently filed a complaint for administrative review. The circuit court found the Director's decision was not against the manifest weight of the evidence and affirmed the Director's decision in full.

---

[1]The Pepsi Subs include the Pepsi-Cola Bottling Company, Inc., of Indianapolis, Indiana; the Pepsi-Cola Bottling Company, Inc., of Jonesboro, Arkansas; and the Pepsi-Cola Bottling Company of Little Rock, Arkansas.

This appeal followed. 735 ILCS 5/3—112 (West 1996); 155 Ill. 2d R. 301.

## ANALYSIS

### Unitary Business Group

■ Where a corporate taxpayer operates in more than one state, the amount of income fairly attributable to the taxing state must be determined before income tax may be constitutionally imposed. *General Telephone Co. v. Johnson*, 103 Ill. 2d 363, 368, 469 N.E.2d 1067 (1984). If the taxpayer owns and operates two distinct businesses located in different states, the taxpayer can account separately for the income of each business and accurately allocate income to the taxing states. However, where a corporate taxpayer conducts a single, functionally integrated business in several states, *i.e.*, a unitary business, separate accounting will likely be insufficient to apportion income among the various taxing states. Thus, many states, including Illinois, have developed formulas for apportioning income to their state from unitary businesses. *Citizens Utilities Co. v. Department of Revenue*, 111 Ill. 2d 32, 39-40, 488 N.E.2d 984 (1986); *General Telephone Co.*, 103 Ill. 2d at 369; 35 ILCS 5/304(a) (West 1996).

■ A corporate taxpayer may also be a member of a unitary business group—"a closely associated group of corporations that collectively engages in a multistate unitary business." *General Telephone Co.*, 103 Ill. 2d at 371. Where a part of the group's business is conducted in Illinois, a "combined apportionment" method is used to determine the business income attributable to this state by any member of the group. *General Telephone Co.*, 103 Ill. 2d at 370-71; 35 ILCS 5/304(e) (West 1996). Borden does not challenge the methodology for apportioning income. Rather, Borden appeals the Director's determination that the Pepsi Subs were part of Borden's unitary business group for tax years 1981 and 1982.

■ ■ Generally, whether a taxpayer participated in a unitary business group is a question of fact for the Department to determine, which will not be reversed on review unless it is against the manifest weight of the evidence. *Citizens Utilities Co.*, 111 Ill. 2d at 47. Here, however, the facts were not in dispute. The case proceeded before the ALJ upon 93 stipulated facts and 41 joint exhibits. The legal effect to be given to these undisputed facts is a matter of law (*American National Bank & Trust Co. v. Department of Revenue*, 242 Ill. App. 3d 716, 721, 611 N.E.2d 32 (1993)), and this court is not bound by the agency's or the circuit court's legal conclusions (*Obasi v. Department of Professional Regulation*, 266 Ill. App. 3d 693, 699, 639 N.E.2d 1318 (1994); *Kroger Co. v. Department of Revenue*, 284 Ill. App. 3d 473,

482, 673 N.E.2d 710 (1996)). Under such circumstances, the proper standard of review is not the manifest weight of the evidence test, but whether the agency's decision is arbitrary, unreasonable and not supported by sufficient evidence. *Obasi*, 266 Ill. App. 3d at 699.

With respect to tax year 1981, no statutory definition of "unitary business group" had yet been adopted by our legislature. However, combined apportionment was required for such groups. *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 417 N.E.2d 1343 (1981). In *Caterpillar Tractor Co.*, our supreme court described a unitary business as follows:

> "A unitary business operation is one in which there is a high degree of interrelationship and interdependence between, typically, one corporation, which generally is a parent corporation, and its corporate subsidiaries or otherwise associated corporations, which group is usually engaged in multistate, and in some cases in international, business operations. Because of this integrated relationship, which is reflected in all phases of the business operations, it is extremely difficult, for purposes of taxation, to determine accurately the measure of taxable income generated within a State by an individual corporation of the unitary group which is conducting business in the State. Typically, the corporation's transactions and the income derived from them actually represent the business efforts of the individual corporation, plus efforts of other and possibly all members of the unitary business operation. As a result, the claimed income of each member of the group standing alone does not, in a real sense, reflect the conducting of a unitary business operation because the income is not attributable solely to the effort of the particular corporation." *Caterpillar Tractor Co.*, 84 Ill. 2d at 108.

The Department also promulgated a regulation, effective December 29, 1981, which describes a "unitary business" as follows:

> "A trade or business carried on by more than one person is unitary in nature when the persons are related through common ownership and when the trade or business activities of each of the persons are integrated with, dependent upon, or contribute to the activities of one or more of the other persons." 6 Ill. Reg. 582 (eff. December 29, 1981) (now 86 Ill. Adm. Code § 100.3010(c)(1) (1996)).

The regulation also lists three factors, the presence of any one of which creates a strong indication that the activities of the taxpayers constitute a unitary business: (1) when all of the activities are in the same general line; (2) when the activities are steps in a vertical process; and (3) when there is a strong central management. 86 Ill. Adm. Code §§ 100.3010(c)(1)(A), (c)(1)(B), (c)(1)(C) (1996).

The Department's definition of unitary business is similar, but not identical, to the statutory definition which became effective December 15, 1982, for tax years ending on or after December 31, 1982 (see Pub. Act 82—1029, eff. December 15, 1982). The statutory definition reads in relevant part:

> "The term 'unitary business group' means a group of persons related through common ownership whose business activities are integrated with, dependent upon and contribute to each other. *** Unitary business activity can ordinarily be illustrated where the activities of the members are: (1) in the same general line (such as manufacturing, wholesaling, retailing of tangible personal property, insurance, transportation or finance); or (2) are steps in a vertically structured enterprise or process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining, and marketing); and, in either instance, the members are functionally integrated through the exercise of strong centralized management (where, for example, authority over such matters as purchasing, financing, tax compliance, product line, personnel, marketing and capital investment is not left to each member)." Ill. Rev. Stat. 1983, ch. 120, par. 15—1501(a)(28) (now 35 ILCS 5/1501(a)(27) (West 1996)).

■ On appeal, Borden contends that the threshold for unitary treatment—functional integration—has not been crossed, and that given the restrictive nature of the bottling agreements between the Pepsi Subs and Pepsi, no such integration could have taken place. We disagree.

In support of its conclusion that Borden and the Pepsi Subs were functionally integrated, the Director cited the following stipulated facts:

> "1. The Pepsi-Subs were members of the Dairy and Services Division of Borden's food segment which included other Borden subsidiaries; in October, 1980, Borden reorganized various divisions and the Pepsi-Subs became a part of the Specialty Products Group of Borden's Consumer [P]roducts Division[;]
>
> 2. Borden's Internal Audit Department monitored the activities and accounting procedures of Borden's subsidiaries, including the Pepsi-Subs;
>
> 3. Borden's Controller managed and oversaw the accounting functions of all Borden subsidiaries including the Pepsi-Subs. The Pepsi-Subs used the same outside accounting firm that Borden used. Borden managed the way the Pepsi-Subs reported their financial data to Borden to facilitate the preparation of consolidated financial reports[;]
>
> 4. Borden's Tax Department prepared tax returns for the Pepsi-Subs[;]

5. All of Borden's subsidiaries, including the Pepsi-Subs, participated in a centralized cash management system that was controlled by Borden's Treasurer;

6. Borden's Employee Relations and Legal Departments provides services to all of the Borden subsidiaries, including the Pepsi-Subs;

7. Borden's [I]nsurance Department administered various insurance program[s] for all of Borden's domestic subsidiaries, including the Pepsi-Subs;

8. Borden's Employee Benefits Department administered employee benefit programs for Borden's domestic subsidiaries, including the Pepsi-Subs;

9. The Pepsi-Subs participated in Borden's minority purchasing program and were required to follow Borden's affirmative action program and television advertising policy[;]

10. Borden approved the Pepsi-Subs' operating budget and capital expenditures[;]

11. Borden appointed the officers of the Pepsi-Subs;

12. Borden determined the compensation and benefit packages for the officers of the Pepsi-Subs;

13. Two officers of the Pepsi-Subs later became officers of a Borden division. One of these officers approved the budgets and capital expenditures of the Pepsi-Subs;

14. The centralized services provided to the Borden subsidiaries were provided at cost or without charge[.]"

These facts demonstrate that Borden treated the Pepsi Subs as it did its other subsidiaries, which Borden conceded were part of its unitary business. Further, the Tax Act states that functional integration is demonstrated "where, for example, authority over such matters as purchasing, financing, tax compliance, product line, personnel, marketing and capital investment is not left to each member." Ill. Rev. Stat. 1983, ch. 120, par. 15—1501(a)(28) (now 35 ILCS 5/1501(a)(27) (West 1996)). The stipulated facts make clear that Borden retained control over financing, tax compliance, and at least some aspects of purchasing, personnel, and marketing. Thus, we cannot accept Borden's conclusion that the Pepsi Subs were autonomous. We find *Citizens Utilities Co.*, on which the Department relies, instructive.

In *Citizens Utilities Co.*, our supreme court considered whether the corporate taxpayer was part of the parent corporation's unitary business. The taxpayer was a wholly owned subsidiary of the parent, which controlled 24 similar corporations. The taxpayer was the only subsidiary which operated solely in Illinois. With few exceptions, the parent and the subsidiaries shared the same officers as well as

interlocking boards of directors. The parent specifically approved all expenditures by the subsidiaries in excess of a certain amount, reviewed major engineering projects, and provided legal assistance and complex accounting functions (including preparation of tax returns), at cost. Revenues deposited by the taxpayer could be withdrawn by the parent at any time, thus providing a vehicle for making interest-free loans for investment in another subsidiary. Based on the foregoing evidence, the court concluded that the hearing officer's determination that the taxpayer was part of the parent's unitary business was not against the manifest weight of the evidence.

Many of the factors that our supreme court found dispositive in *Citizens Utilities Co.* are present here, and although *Citizens Utilities Co.* involved tax years pre-1981, the court's rationale is sound under both the 1981 departmental regulation and section 1501 of the Tax Act. It is also consistent with United States Supreme Court precedent, which generally looks to three objective factors as indicative of a unitary business: functional integration, centralization of management, and economies of scale. See *Allied-Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768, 781-83, 119 L. Ed. 2d 533, 548-49, 112 S. Ct. 2251, 2259-61 (1992) (and cases cited therein).

Citing *F.W. Woolworth Co. v. Taxation & Revenue Department*, 458 U.S. 354, 73 L. Ed. 2d 819, 102 S. Ct. 3128 (1982), Borden further argues that the Director's finding that Borden "could" exercise influence over the activities of the Pepsi Subs falls short of the requirement that Borden exercise "actual" control over centralized functions. In *F.W. Woolworth Co.*, the United States Supreme Court held that the mere potential of the parent corporation to operate its subsidiaries as integrated divisions of a unitary business was insignificant if, in fact, the subsidiaries comprised discrete business operations.

The evidence in that case demonstrated that, despite the potential for control, no phase of any subsidiary's business was integrated with the parent's business. Site selection of new stores, merchandise selection, advertising, and accounting were performed by each subsidiary independently of the parent company. Each subsidiary also had a complete accounting department and financial staff. There was no centralized purchasing, manufacturing, or warehousing of merchandise, and little overlap of officers. Further, each subsidiary possessed autonomy to determine its own retailing policies. That is not the case here.

Further, the Director's decision states that "strong centralized management existed between Borden and [the] Pepsi-Subs" and that

the "stipulated record demonstrates a high degree of centralization of functions." The Director also stated that "the exercise of strong centralized management shows that functional integration exists between Borden[ ] and [the] Pepsi-Subs." The sufficiency of such findings is clear, particularly in light of this court's recent decision in *A.B. Dick Co. v. McGraw*, 287 Ill. App. 3d 230, 678 N.E.2d 1100 (1997).

In *A.B. Dick*, this court rejected the notion that functional integration is a separate concept from centralized management and held that "whenever there is functional integration of operations there is also strong centralized management and vice versa." *A.B. Dick*, 287 Ill. App. 3d at 233. If one or the other has been shown, then there is a unitary business. *A.B. Dick*, 287 Ill. App. 3d at 233. The stipulated facts here demonstrate a strong centralized management and, accordingly, that functional integration has occurred. That the Director also stated that Borden "could" exert great influence over the Pepsi Subs does not detract from the substance of the decision. In any event, the issue of whether the parent possessed the potential for control has been found relevant to, although not dispositive of, the existence of a unitary business. See *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 177 n.16, 77 L. Ed. 2d 545, 561 n.16, 103 S. Ct. 2933, 2946 n.16 (1983).

In light of the foregoing, it cannot be said that the Director's decision is arbitrary, unreasonable, and not supported by sufficient evidence. *Obasi*, 266 Ill. App. 3d at 699. Accordingly, the circuit court's order affirming the Director's decision as to the existence of a unitary business is affirmed.

### Business v. Nonbusiness Income

■ Borden next challenges the Department's determination that the capital gains from the sale of the Pepsi Subs stock was "business income." Under the Tax Act, where a taxpayer derives its business income from this state and one or more other states, such income is subject to "apportionment," *i.e.*, using the statutory formula, the income is apportioned among the various jurisdictions in which the taxpayer conducts his business. Ill. Rev. Stat. 1981, ch. 120, par. 3—304(a) (now 35 ILCS 5/304(a) (West 1996)); *National Realty & Investment Co. v. Department of Revenue*, 144 Ill. App. 3d 541, 553, 494 N.E.2d 924 (1986).

"Nonbusiness income," on the other hand, is subject to "allocation," *i.e.*, nonbusiness income is assigned in its entirety to a particular taxing jurisdiction based on certain statutory criteria, such as the situs of the property. Ill. Rev. Stat. 1981, ch. 120, par. 3—303 (now 35 ILCS 5/303 (West 1996)); *National Realty*, 144 Ill. App. 3d at 553.

■ "Business income" is defined under the Tax Act in pertinent part as:

> "[I]ncome arising from transactions and activity in the regular course of the taxpayer's trade or business *** and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." Ill. Rev. Stat. 1981, ch. 120, par. 15—1501(a)(1) (now 35 ILCS 5/1501(a)(1) (West 1996)).

"Nonbusiness income" is defined as "all income other than business income or compensation." Ill. Rev. Stat. 1981, ch. 120, par. 1501(a)(13) (now 35 ILCS 5/1501(a)(13) (West 1996)). A taxpayer's income is business income unless it is clearly classifiable as nonbusiness income. *Kroger Co.*, 284 Ill. App. 3d at 479; 86 Ill. Adm. Code § 100.3010(a) (1996).

■ Illinois courts have construed section 1501(a)(1) of the Tax Act as embodying both a "transactional" test and a "functional" test to determine whether income is business income. *Kroger Co.*, 284 Ill. App. 3d at 479-80; *Dover Corp. v. Department of Revenue*, 271 Ill. App. 3d 700, 711, 648 N.E.2d 1089 (1995); *National Realty*, 144 Ill. App. 3d at 554-55. "If either test is met, the income constitutes business income." *Dover Corp.*, 271 Ill. App. 3d at 711; *National Realty*, 144 Ill. App. 3d at 554.

Under the transactional test (derived from the first clause of section 1501(a)(1)), if the income results from a business transaction in which the taxpayer regularly engages, it is business income. *Dover Corp.*, 271 Ill. App. 3d at 711. Under the functional test (derived from the second clause of section 1501(a)(1)), the relevant inquiry is whether the property was used in the taxpayer's regular trade or business operations. *Dover Corp.*, 271 Ill. App. 3d at 712.

The ALJ determined that the transactional test was met. Referring to Borden's own annual reports, the ALJ noted that at the time the stock was sold, Borden was undergoing a massive restructuring and that part of this plan involved a redeployment of assets under which certain companies, including the Pepsi Subs, were sold. The proceeds were utilized to help fund a $1.5 billion capital investment program that would run through 1985. The ALJ concluded, and the Director agreed, that the sale of the Pepsi Subs was part of an overall corporate plan to expand and consolidate Borden's unitary business, and that the acquisition, management and disposition of the Pepsi Subs stock constituted integral parts of Borden's regular trade or business. The circuit court affirmed.

■ Although no Illinois case is directly on point, the Department's

regulations shed some light on the difference between business versus nonbusiness income. For example, with respect to gains or losses from sales of assets, where a corporation constructed a plant for use in its multistate manufacturing business and 20 years later sold the property at a gain while it was in operation by the corporation, the gain is business income. 86 Ill. Adm. Code § 100.3010(d)(3)(B) (1996). With respect to dividends, where a corporation is engaged in a multistate manufacturing business and also holds a portfolio of stock and interest-bearing securities, the acquisition and holding of which are unrelated to the corporation's trade or business operations, the dividends and interest income received are nonbusiness income. 86 Ill. Adm. Code § 100.3010(d)(5)(F) (1996).

The Pepsi Subs stock was not held as part of a portfolio of stocks which was unrelated to Borden's multistate business. Further, in light of Borden's restructuring and massive capital investment program, it cannot be said that income from the sale of the stock is so removed from Borden's trade or business as to be "clearly classifiable as nonbusiness income." *Kroger*, 248 Ill. App. 3d at 479.

Finally, Borden argues that the circuit court's decision finding that the functional test had been met renders meaningless any distinction between business and nonbusiness income. In support of its position, Borden cites *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982).

In *ASARCO*, the United States Supreme Court rejected the Idaho Tax Commission's assertion that income from intangible property should be considered part of a unitary business when the intangibles "contribute to or relate to or are some way in furtherance of the taxpayer's own trade or business." *ASARCO*, 458 U.S. at 326, 73 L. Ed. 2d at 801, 102 S. Ct. at 3114. The court explained:

> "The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently *all* of its operations, including any investment made, in some sense can be said to be 'for purposes related to or contributing to the [corporation's] business.' When pressed to its logical limit, this conception of the 'unitary business' limitation becomes no limitation at all." (Emphasis in original.) *ASARCO*, 458 U.S. at 326, 73 L. Ed. 2d at 801, 102 S. Ct. at 3114.

We need not resort to the expansive test rejected by the Supreme Court in *ASARCO* in order to find that the sale of the Pepsi Subs stock was business income. The stock was not held as a passive investment, nor as one stock in a portfolio of stocks unrelated to Borden's unitary business. The Pepsi Subs were in the same general line of business as Borden, were part of Borden's unitary business, and

their ultimate disposition was directly related to Borden's restructuring, a program that would take several years to complete. Based upon the foregoing, the Department's decision to categorize the capital gains as business income is not arbitrary or unreasonable and is supported by sufficient evidence. *Obasi*, 266 Ill. App. 3d at 699.

Accordingly, the decision of the circuit court is affirmed in its entirety.

Affirmed.

HARTMAN and SOUTH, JJ., concur.