FIRST DIVISION

October 27, 2003

Nos. 1-01-2861 & 1-02-0386 (Consolidated)

ZEBRA TECHNOLOGIES CORPORATION,                      

Plaintiff-Appellant and Cross- Appellee,

v. 

JUDY BAAR TOPINKA, as Treasurer of the State of Illinois, and THE DEPARTMENT OF REVENUE, 

Defendants-Appellees and Cross-Appellants.

) Appeal from the 

) Circuit Court

) of Cook County.

)

)

) 

)

)

)

)

) Honorable

) Joanne L. Lanigan,

) Judge Presiding.

)

)

)

Modified Upon Denial of Rehearing

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

The Illinois Department of Revenue (the Department) conducted an audit of Zebra Technologies' (taxpayer) corporate income tax returns for the years ended 1993, 1994 and 1995 (audit period).  The Department included in taxpayer's unitary group subsidiaries that taxpayer previously excluded and treated certain income as business income that had been allocated to another state as nonbusiness income.  Taxpayer paid all proposed adjustments with interest under protest.  The Department did not issue an official notice of deficiency.  Taxpayer then filed an action in the circuit court of Cook County.  The circuit court found in favor of the Department.  Taxpayer filed this timely appeal and we now affirm.     

 BACKGROUND

Taxpayer is a corporation engaged in the business of manufacturing two-dimensional bar coding equipment and related supplies that it sells throughout the world.  Taxpayer is incorporated in Delaware with its corporate headquarters located in Vernon Hills, Illinois, and has several wholly owned subsidiaries located both within and outside the United States.  Taxpayer, through its employees, developed patents, trademarks and other intellectual property, both before and after the audit period, used in the manufacture and sale of its products.  Taxpayer deducted from its taxable income the expenses it incurred to develop and maintain this intellectual property. 

Charles Whitchurch was taxpayer's chief financial officer and a director in each of the subsidiaries involved in this matter.  Additionally, at all times during the audit period, a majority of the directors of each subsidiary referenced in this appeal were also officers or directors of taxpayer.  Each subsidiary is described in greater detail below.  

Bermuda Subsidiaries

In 1994, taxpayer incorporated two wholly owned subsidiaries in Delaware, Zebra Domestic Intangibles (ZDI) and Zebra International Intangibles (ZII).  Taxpayer transferred all of its intellectual property to ZDI and ZII and then each corporation licensed the intellectual property back to taxpayer and taxpayer's affiliated companies.  ZDI licensed intellectual property used in the United States, while ZII licensed intellectual property used outside the United States.  

ZDI and ZII charged a royalty of 9.5% of the gross sales of the products using the intellectual property to taxpayer and its affiliated corporations.  After receiving the royalty payment, ZDI and ZII would pay its respective expenses and would declare a dividend of the remaining amount to taxpayer.  Transfers of these funds occurred at a bank located in Illinois where taxpayer, ZDI and ZII had accounts.  Taxpayer would transfer the royalty payments from its account at the bank located in Illinois to ZDI and ZII's account at the same bank.  ZDI and ZII would simply do the reverse of the aforementioned transaction, minus expenses, to pay out the dividend to taxpayer.  Taxpayer contends that the purpose of incorporating ZDI and ZII was to own, protect and license trademarks, patents and other intellectual property once belonging to taxpayer.  

In 1995, ZDI and ZII moved its corporate headquarters to Hamilton, Bermuda, where each company rented office space and each paid $1,000 for a computer.  Each company employed Steven Hantelman, a former certified public accountant and investment banker, to manage business affairs for the companies.  He had no experience in managing intellectual property, trademark rights or patents.  He testified that his services consisted mostly of signing registration applications and renewal papers sent to him by the law firm that handled taxpayer's intellectual property matters.  Hantelman also testified that he received quality control reports from taxpayer's department heads which he read, signed and filed.  Hantelman was paid $600 per month by each company for the performance of various duties related to the business of ZDI and ZII pursuant to an employment agreement.    

Delaware Subsidiary

In 1993, taxpayer incorporated ZIH, Inc., a wholly owned subsidiary of taxpayer, in Delaware with its corporate headquarters located in Wilmington, Delaware.  Taxpayer contributed two large portfolios of cash and marketable securities to ZIH in exchange for all of ZIH's capital stock in 1993.  ZIH placed the portfolios of cash and marketable securities with Smith Barney and Capital Insight, professional investment corporations, to invest and reinvest the earnings in accordance with taxpayer's investment policies.  Whitchurch oversaw the managers' compliance with taxpayer's investment policy and recommended that the portfolio managed by Capital Insight be liquidated, thereafter ZIH implemented this recommendation.  A local company provided site management services for ZIH in Wilmington, Delaware.

During taxpayer's audit period, ZIH owned two subsidiaries.  In September 1993, Zebra Technologies Preston (Preston) was created as a wholly owned subsidiary of ZIH for the purpose of acquiring all the assets of an unrelated company known as Brooks Labels & Consulting (Brooks).  In order to accomplish the acquisition of Brooks Labels, ZIH contributed $828,025
(footnote: 1) in the form of a promissory note to Preston and Preston immediately used the cash to purchase the assets of Brooks Labels.  In April 1994, ZIH made a capital contribution to Preston of the note securing the loan to Preston.  Also in April 1994, ZIH acquired a second subsidiary, Zebra Technologies Europe, Ltd. (Europe), that had been organized as a wholly owned subsidiary of taxpayer, but was later organized as a wholly owned subsidiary of ZIH through an exchange of stocks plus a payment of $12,661 by ZIH to taxpayer.  Preston then became a wholly owned subsidiary of Europe.  Taxpayer's Illinois income tax returns for the audit period listed ZIH as a part of its unitary business group, but classified the income as nonbusiness income allocable to the state of commercial domicile. 

The Audit and Trial

The Department conducted an audit of taxpayer's Illinois corporate income tax returns for the years ending December 31, 1993, 1994 and 1995.  In its returns for tax years 1994 and 1995, taxpayer excluded ZDI and ZII from its unitary business group.  For the tax years 1993, 1994 and 1995, taxpayer included ZIH in its unitary business group, but allocated all of its income to Delaware, its state of commercial domicile, as nonbusiness income.  

Pursuant to its audit, the Department included ZDI and ZII in the unitary business group for the 1993 and 1994 tax years and included ZIH's income as business income, subject to apportionment in Illinois.  The Department did not impose any penalties and taxpayer paid, under protest, the amount of all proposed adjustments in full with interest.  Taxpayer then filed this action in the circuit court of Cook County seeking a determination of its actual income tax liability and a refund for any overpayments.

After a three-day bench trial, the circuit court entered an order on July 23, 2001, finding that all subsidiaries in question were properly included in taxpayer's unitary business group for purposes of section 1501 of Illinois Income Tax Act (the Act) (35 ILCS 5/1501 (West 2000)).  The trial court also found that the income of ZIH was taxable in Illinois to the extent that the income was used to fund corporate acquisitions, but not taxable as to any amount not used in business operations.  

 The trial court's first order determined neither the amount of tax owed to the Department nor the refund, if applicable, to taxpayer.  At taxpayer's request, the circuit court issued a second order on August 8, 2002, making a Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) finding relative to most of the July 23, 2001 order.  The parties then entered into a stipulation as to the amount that would be refunded to taxpayer from the protest fund if the circuit court's ruling in the July 23, 2001, order were applied to the facts of this action.  Pursuant to this stipulation, the trial court entered a judgment specifying the amount to be refunded to taxpayer in accordance with the rulings in its July 23, 2001, order.  Taxpayer filed a new notice of appeal and the Department cross-appealed claiming that all income earned by ZIH was subject to apportionment as business income, not just the amount actually used in the acquisition of new corporations.   

ANALYSIS

I. Standards of Review

This court reviews pure questions of law under a 
de
 
novo
 standard of review, without deference to the circuit court concerning the content of any rule of law relevant to this proceeding.  
Zeitz v. Village of Glenview
, 304 Ill. App. 3d 586, 592, 710 N.E.2d 849 (1999).  The circuit court’s finding of fact, however, is entitled to deference by this court and may be reversed only if it is contrary to the manifest weight of the evidence.  
Zeitz
, 304 Ill. App. 3d at 592.  Mixed questions of fact and law, which involve the application of law to a particular set of facts, are subject to review under the clearly erroneous standard, affording the circuit court less deference than for questions of fact.  
Zeitz
, 304 Ill. App. 3d at 592.  Under the clearly erroneous standard of review, a finding by the trial court may be reversed only if, after careful examination of the record in light of the applicable rule of law, the reviewing court is left with the "definite and firm conviction" that the finding is in error.  
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 395, 763 N.E.2d 272 (2001).

II. Jurisdiction

The Department argues in its brief that this court lacks jurisdiction over appeal number 1-01-2861.  Without belaboring this point, we agree with the Department because the trial court's original order was not a final judgment under Supreme Court Rule 304 (155 Ill. 2d R. 304).  Appeal number 1-01-2861 is therefore dismissed.  The Department, however, conceded at oral argument that the trial court's subsequent order incorporating the parties' stipulations was a final judgment as contemplated by Rule 304 (155 Ill. 2d R. 304) and appeal number 1-02-0386 is otherwise identical to appeal number 1-01-2861.  This court properly has jurisdiction over appeal 1-02-0386 and we will address the claims therein.

III. The Bermuda Subsidiaries

Taxpayer contends that the trial court erred as a matter of law in failing to exclude ZDI and ZII from taxpayer's unitary group.  It claims that the trial court found that all property owned and leased by ZDI and ZII was located outside the United States and that all compensation paid by ZDI and ZII was paid for services rendered in Bermuda.  Based on these findings, taxpayer argues that the trial court was required to exclude the two subsidiaries from the unitary group.  Although taxpayer characterizes this issue as a flawed legal conclusion made by the trial court to be reviewed 
de
 
novo
, we view this contention as a factual decision that will be disturbed only if against the manifest weight of the evidence
.  
Zeitz
, 304 Ill. App. 3d at 592.

Section 1501 (a)(27) of the Act provides, in pertinent part:  "The group will not include those members whose business activity outside the United States is 80% or more of any such member's total business activity ***."  35 ILCS 5/1501(a)(27) (West 2000).  After reviewing the record, we are of the view that taxpayer misstates the finding of the trial court.  In its order, the trial court never indicated that all payroll was located outside of the United States.  Although the court found that Hantelman was an employee and properly included in ZDI and ZII's payroll in Bermuda and not considered to be within the United States for purposes of section 1501(a)(27) of the Act, commonly referred to as the 80/20 rule, it also determined that other activities related to the functions of ZDI and ZII were conducted within the United States.  

For purposes of clarity, we find it appropriate to include a significant portion of the trial court's findings in its written order to show that it did not find, as taxpayer alleges, that all payroll was found to be in Bermuda.  The court made the following findings in its order:

   "For Zebra to satisfy the 80/20 rule, it must prove that 80% or more of its property and payroll factors are outside the United States.  This was established by a lease executed in 1995 and the purchase of a computer in 1995 which was paid by Domestic [ZDI] and International [ZII].  The evidence established that Domestic and International had no payroll in 1994.  The employment agreement did not commence until January 1, 1995.  Mr. Hantelman testified that he executed an employment contract with each company and was paid a salary of $600.00 a month by each from which income and payroll taxes were withheld.  He testified that he dealt with outside patent counsel to register and protect the intellectual property owed by the two corporations and he performed quality control in addition to his other duties with respect to operating the companies.  He testified both companies had separate bank accounts in Bermuda from which he paid the companies' expenses and both companies had an account at American National Bank in Chicago.  He testified that he prepared invoices for royalty fees and collected those fees.  He testified he executed wire transfers from the American National Bank account to pay dividends declared by the companies which then were deposited into an account of Zebra at American National Bank.  Mr. Hantelman testified he had no prior experience dealing with patents or trademarks.  When the quality control assurance reports were sent to the companies he read them and filed them.  He testified he was under control of the Board of Directors of both companies as to performance of his duties.  He was told how to set up the accounting system for the companies.  He sent written reports to Zebra regularly.  Even though Mr. Hantelman worked for other companies, based on his testimony and the testimony of Mr. Johnson the manifest weight of the evidence shows that Mr. Hantelman was a part-time employee for Domestic and International and the performance of his duties was under the control and supervision of the Bermuda companies.

   
Despite these findings
, the testimony and the documents introduced into evidence clearly indicate Domestic and International had other individuals in the U.S. performing activities for these companies.  Mr. Hantelman testified that one of his duties was to protect the intellectual property and he performed quality control.  Quality control by the licensor (the Bermuda Companies) was required by the License Agreements introduced into evidence by the department as its exhibits 18 and 19.  The evidence, however, showed that while the Bermuda Companies issued the licenses to use the patents, Mr. Hantelman never performed any quality control.  Mr. Hantelman testified that it was Zebra that had a quality control committee comprised of department heads and managers in various areas and they would prepare a set of minutes from each of their meetings where they went through strict guidelines established by Zebra.  He would receive the quality control committee minutes, review them and then file them.  Mr. Whitchurch also testified that one of the business activities of the two Bermuda companies was to insure that trademarks appeared on quality products and that the value of the trademarks was not decreased by appearing on products of inferior quality.  As noted previously, Mr. Hantelman testified he had no previous business experience working with patents, trademarks or intellectual property.  His duties as an employee were ministerial.  The highly important function of protecting the patents was retained by Zebra, the Taxpayer, at no cost to the Bermuda companies.  There was no evidence of a contractual relationship between Zebra and the Bermuda companies for the purchase of these highly technical services.  This situation requires a look at substance over form.  These monthly meetings of the quality control committee evince a considerable amount of business activity taking place in the U.S. for Domestic and International.  The Department's witness stated there was no statute that allowed the Department to impute a payroll figure for these services.  However, Zebra knew the amount of time spent by the committee on quality control issues and was capable of allocating this expense to the Bermuda companies because it was this committee which was protecting the license for these companies.  

   Based on the above this Court finds Zebra did not meet its burden of proof showing that 80% or more of its business activities took place outside the United States."  (Emphasis added.)

The issue properly before the court is whether taxpayer has satisfied its burden to show that it was entitled to exclude ZDI and ZII from its unitary business group.  Taxpayer argues that 
section 1501(a)(27) of the Act prohibits the inclusion of subsidiaries that conduct at least 80% of their business activities outside the United States.  Taxpayer in essence contends that it produced evidence of its payroll and property showing that it complied with the "statutory mandate" and therefore the court should have excluded ZDI and ZII without further analysis or inquiry.  We disagree.  

The 80/20 rule, in our view, is an exception to the rule annunciated in section 304(e) of the Act,
 which states:

   "
Where 2 or more persons are engaged in a unitary business as described in subsection (a)(27) of Section 1501, a part of which is conducted in this State by one or more members of the group, the business income attributable to this State by any such member or members shall be apportioned by means of the combined apportionment method.
"  35 ILCS 5/304(e) (West 2000).

We are mindful that taxation is the rule and tax exemption is the exception.  
Chicago Bar Ass'n v. Department of Revenue
, 163 Ill. 2d 290, 301, 644 N.E.2d 1166 (1994).
  Here, taxpayer is claiming an exemption from tax on income that would otherwise be assessed but for the 80/20 rule.  Thus, taxpayer has the burden of proving clearly that it comes within the statutory exemption.
  
United Air Lines. Inc. v. Johnson
, 84 Ill. 2d 446, 455-56, 419 N.E.2d 899 (1981). 
 Such exemptions are to be strictly construed, and doubts concerning the applicability of the exemptions will be resolved in favor of taxation. 
 
United Air Lines
, 84 Ill. 2d at 455.  

We find that the taxpayer failed to sustain its burden of proving that ZDI and ZII should have been excluded from the unitary group.  Although the trial court agreed that all property owned by ZDI and ZII was located in Bermuda, it found that a considerable amount of business activity relating to development, protection and quality control of the intellectual property took place within the United States.  Because taxpayer knew the extent to which this activity was conducted in the United States, it could have calculated the percentage of the activities conducted within and without the United States such that it could show compliance with the exemption requirements in section 1501(a)(27) of the Act.  35 ILCS 5/1501(a)(27) (West 2000).  Although taxpayer was the only one able to produce the evidence necessary to show that it was entitled to the exclusion under the 80/20 rule, it chose
 to stand on the evidence it produced about the property and Hantelman's salary and nothing more.  The trial court was not required to accept the evidence produced by taxpayer as dispositive, especially when its own witnesses testified on direct examination that elements of development and protection of intellectual property were conducted by taxpayer's employees within the United States.  

We also find it important to note that the Department devoted a large part of its argument to the idea that ZDI and ZII lacked economic substance as an additional basis for finding that ZDI and ZII should be included in taxpayer's unitary group.  Relative to this issue the court made the following statements in its order:

   "The Department argued that the Court should look at substance rather than a form devised by Zebra.  The Department argued Zebra should have a business purpose for engaging in a transaction other that tax avoidance.  Further, the Department contended Mr. Hantelman was an independent contractor because he retained the right to control the manner of doing the work as shown by the evidence.

   * * *

   Mr. Whitchurch testified the business purpose for creating Domestic and International was: 1) to improve the management and control of Zebra's intellectual property; 2) to provide an additional layer of corporate protection for the intellectual property; 3) to take advantage of certain tax benefits; and 4) to permit the financial statements to reflect the true value of the intellectual property by assigning a charge through the royalty mechanism to the products that used this property.  Based on this evidence, which was not refuted, the Court finds there was a genuine economic substance to forming Domestic and International even though the formation of these companies in Bermuda was also for the purpose of avoiding taxes."

We decline to address the Department's argument because the disposition of this issue, whether it be in favor of the Department or taxpayer, would not effect the outcome of our decision.  Here, taxpayer failed to sustain its burden on the threshold issue of qualifying to exclude ZDI and ZII from its unitary business group under section 1501(a)(27) of the Act.  35 ILCS 5/1501(a)(27) (West 2000). 

IV. ZIH Commerce Clause and Due Process Challenge

Taxpayer claims that the trial court erred as a matter of fact and law by subjecting any funds of ZIH to taxation in Illinois.  First, taxpayer claims that none of the funds held by ZIH and used in the reorganization were used for operational purposes and, therefore, any imposition of tax by Illinois on this income would violate the commerce clause of the United States Constitution.  

The due process and commerce clauses of the United States Constitution require that a definite link or minimum connection exist between a state and the transaction it seeks to tax.  
Quill Corp. v. North Dakota
, 504 U.S. 298, 306, 119 L. Ed. 2d 91, 102, 112 S. Ct. 1904, 1909-10 (1992).  As a result, a state may not tax value outside its borders.  
Allied-Signal, Inc. v. Director, Division of Taxation
, 504 U.S. 768, 119 L. Ed. 2d 533, 112 S. Ct. 2251 (1992).  A state may, however, impose a tax on the multistate income of a nondomiciliary corporation if a minimal connection exists between the corporation's activities and the taxing state and a rational relationship exists between the income sought to be taxed by the state and the intrastate value of the corporate business.  
Allied-Signal
, 504 U.S. at 772, 119 L. Ed. 2d at 542, 112 S. Ct. at 2255.

When determining whether a state may apportion corporate income
 
of a nondomiciliary corporation, the United States Supreme Court has applied the "unitary relationship" and "operational function" tests.  
Home Interiors & Gifts Inc. v. Department of Revenue
, 318 Ill. App. 3d 205, 210-11, 741 N.E.2d 998 (2000).  Under the unitary relationship test, the payee and the payor of the dividend or other income have a unitary business relationship.  
Home Interiors
, 318 Ill. App. 3d at 211.  More specifically, although a business may have subsidiaries, divisions, or common ownership of other businesses that operate in different jurisdictions, a single state may tax all the income earned and apportion it because the businesses have common managerial or operational resources that produce economies of scale and a substantial sharing of values.  
Container Corp. of America v. Franchise Tax Board
, 463 U.S. 159, 179, 77 L. Ed. 2d 545, 562, 103 S. Ct. 2933, 2947 (1983).  It is well established that "'[t]he linchpin of apportionability in the field of state income taxation is the unitary-business principle.'"  (Emphasis omitted.)  
ASARCO Inc. v. Idaho State Tax Comm'n
, 458 U.S. 304, 317, 73 L. Ed. 2d 787, 795, 102 S. Ct. 3103, 3109 (1982), quoting 
Mobil Oil Corp. v. Commissioner of Taxes
, 445 U.S. 425, 439, 63 L. Ed. 2d 510, 522, 100 S. Ct. 1223, 1232 (1980).

Under the operational function test, a state may apportion income even though no unitary relationship exists between payee and payor.  
Allied-Signal
, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.  The state has the authority to apportion the income because the capital transaction serves an operational rather
 
than an investment function.  
Allied-Signal
, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.  The relevant inquiry in determining whether an asset serves an investment or operational function "focuses on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State."  
Allied-Signal
, 504 U.S. at 785, 119 L. Ed. 2d at 550, 112 S. Ct. at 2262.  The United States Supreme Court has noted that "a State may include within the apportionable income of a nondomiciliary corporation the interest earned on
 
short-term deposits in a bank located in another State if that income forms part of the working capital of the corporation's unitary business, notwithstanding the absence of a unitary relationship between the corporation and the bank." 
Allied-Signal
, 504 U.S. at 787-88, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.  The Court concluded that the apportionability of interest turns on whether the interest is part of the working capital of the unitary business.  
Allied-Signal
, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.  The existence of a unitary relation between the payor and the payee is one means of meeting the constitutional requirement.  
Allied-Signal
, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.
  If a capital transaction serves an operational rather than an investment function, the constitutional requirement will likewise be met even if no unitary relationship exists between payor and payee.  
Allied-Signal
, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.

Here, although no unitary relationship existed between the professional investment companies and ZIH, the trial court found that the funds used to assist Preston in acquiring Brooks, that came from ZIH, served an operational function rather than an investment function.  The due process and commerce clauses were not violated because the minimal connection necessary between taxpayer and Illinois was satisfied.  The facts and the evidence presented at trial show that a rational relationship existed between the income attributed to Illinois and the intrastate value of the corporate business. 

However, we disagree with the Department as to its claim in its cross-appeal that all interest income earned by ZIH is taxable in Illinois, not just that which was used to acquire Brooks.  We conclude, as did the court in 
Home Interiors
, that taxpayer's use of the funds, not the mere availability of the funds, is the guiding factor in determining whether the income sought to be apportioned has an operational or investment function.
  
Home Interiors
, 318 Ill. App. 3d 212-13.  Here, the operational function test only permits the Department to tax a portion of taxpayer's income from the portfolio investment accounts, because only part of these funds was used as working capital.  The remaining funds within these accounts
 
served an investment function and did not form part of the working capital of plaintiff's business.  Accordingly, we agree with the trial court that, relative to the funds that remained invested, the requisite minimal connection between ZIH and Illinois does not exist and that the investment income was not rationally related to the operations of taxpayer.

V. Business and Nonbusiness Income

Taxpayer next claims that even if Illinois can constitutionally tax ZIH's income, the entire amount of interest income at issue is nonbusiness income and subject to allocation to Delaware, ZIH's state of commercial domicile.  The Department argued that all of the income earned by ZIH was business income and was subject to taxation in Illinois on an apportioned basis.  

We begin the analysis of this issue with the definition of "business income."  Section 1501(a)(1) of the Act defines "business income" as follows:

   "The term 'business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business, net of the deductions allocable thereto, and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  35 ILCS 5/1501(a)(1) (West 2000).  

Income is presumed to be business income unless it is clearly classifiable as nonbusiness income.  
Automatic Data Processing, Inc. v. Department of Revenue
, 313 Ill. App. 3d 433, 440, 729 N.E.2d 897 (2000).  Courts have interpreted the statute as setting out two tests for determining whether income is business income, namely, the "transactional test" and the "functional
 test."  
National Realty & Investment Co. v. Department of Revenue
, 144 Ill. App. 3d 541, 554, 494 N.E.2d 924 (1986).  Income is properly classified as business income if either test is met.  
Borden, Inc. v. Department of Revenue
, 295 Ill. App. 3d 1001, 1010, 692 N.E.2d 1335 (1998).  The taxpayer has the burden to show that a disputed gain is not business income.  
National Realty
, 144 Ill. App. 3d at 553, 494 N.E.2d at 932 (1986).  

The transactional test is used to determine whether the income in question arises from transactions and activities in which the taxpayer regularly engages.  
Borden
, 295 Ill. App. 3d at 1010, 692 N.E.2d at 1341.  The functional test, on the other hand, determines whether the income comes from the acquisition, management and disposition of property used in the taxpayer's regular trade or business.  
National Realty
, 144 Ill. App. 3d at 554, 494 N.E.2d at 932. 

Here, the court did not find that the transactional test was satisfied.  The court noted that the portfolios were transferred to ZIH from taxpayer and never reverted back, no inter-company loans were issued and the portfolios were never used as collateral for other obligations.  The investments did not arise from transactions or activities in which the taxpayer regularly engaged.  
Automatic Data Processing
, 313 Ill. App. 3d at 440.  We agree with the findings of the trial court that the transactional test was not satisfied. 

The trial court then applied the functional test and determined that the funds used by ZIH that came from the portfolios to effectuate the acquisition of Brooks satisfied the requirements under the functional test.  Notwithstanding taxpayer's claim that no funds were used for an operational purpose, the trial court found that the contribution of capital to Preston was business income because those funds were eventually used to acquire Brooks.  Relative to this issue, Whitchurch wrote a memo to taxpayer's board of directors in 1993 explaining the purpose of forming ZIH.  The memo, which was admitted into evidence, read in pertinent part:

   "The purpose of the Subsidiary would be to manage the Investment Portfolios.  The Subsidiaries' income would consist of dividends and interest earned on its investments and capital gains or losses from the sale of its investments.  Since the purpose of the Investment Portfolios has always been to provide capital for financing potential corporate acquisitions by the company and no such acquisitions have been made as of this date, the Investment Portfolios would continue to be earmarked for such company acquisitions."  

After reviewing the record, we agree with the trial court's conclusion.  The evidence in the record indicates that the two investment portfolios were earmarked for corporate acquisitions both before and after the transfer to ZIH.  Whitchurch testified at trial that money from the investment funds was used to complete a corporate reorganization that involved the changing of ownership of Preston within taxpayer's corporate family.  We find that the functional test was met when ZIH used the funds for a corporate reorganization and acquisition in accordance with taxpayer's designated purpose for the use of the portfolios.  The record reflects that the acquisition, management and disposition of funds were an integral part of taxpayer's business operation, and we agree that the income from the investments used to acquire Brooks served an operational rather than an investment function.  
Texaco-Cities Service Pipeline Co. v. McGaw
, 182 Ill. 2d 262, 269, 695 N.E.2d 481 (1998).  Accordingly, that income was properly taxable on an apportioned basis in Illinois.  

VI. ZIH as Part of the Unitary Group

Taxpayer next contends that ZIH was improperly included in its unitary group and the tax imposed violated article IX, section 2, of the Illinois Constitution (uniformity clause), which provides:

   "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly.  Exemptions, deductions, credits, refunds and other allowances shall be reasonable."  Ill. Const. 1970, art. IX, § 2.

Taxpayer argues that even though it filed its corporate income tax returns with ZIH as part of the unitary group, it should have been excluded from the group because it was a financial organization under section 1501(a)(8) of the Act.  At trial, the court determined that ZIH did not qualify as a financial organization because it was not a regulated investment company and that the distinction drawn between regulated and nonregulated investment companies did not violate the uniformity clause of the Illinois Constitution.  

Section 304(c) of the Income Tax Act requires that "financial organizations" use a formula different from ordinary three-factor apportionment.  This formula multiplies the organizations' income by a 
fraction, the numerator of which is the business income from within the state and the denominator of which is business income from all sources.  35 ILCS 5/304(c) (West 2000).  The business income from within Illinois consists of:

   "(A) Fees, commissions or other compensation for financial services rendered within this State;

   (B) Gross profits from trading in stocks, bonds or other securities managed within this State;

   (C) Dividends, and interest from Illinois customers, which are received within this State;

   (D) Interest charged to customers at places of business maintained within this State for carrying debit balances of margin accounts, without deduction of any costs incurred in carrying such accounts; and

   (E) Any other gross income resulting from the operation as a financial organization within this State."  35 ILCS 5/304(c) 
(West 2000).

Section 1501(a)(8) of the Act defines "financial organization" as: "any bank, bank holding company, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, building and loan association, credit union, currency exchange, cooperative bank, small loan company, sales finance company, 
investment company
, or any person which is owned by a bank or bank holding company." (Emphasis added.)  35 ILCS 5/1501(a)(8) (West 2000).  Taxpayer claims that ZIH is a financial organization within the meaning of the Income Tax Act because it is an investment company.  The Department argues that the Act should be interpreted to require that a financial organization be a regulated investment company registered with a governmental agency and conducting its business with the public, even though no definition is given for the term "investment company." 

At the outset, we note that this court considered this same issue in 
Automatic Data Processing
, 313 Ill. App. 3d at 442-46, although it did not consider whether the distinction between regulated and nonregulated investment companies violated the uniformity clause of the Illinois Constitution.  The 
Automatic Data Processing
 court held that the term "investment company" should be understood as a term of art requiring corporations that qualify as investment companies comply with certain regulations, including registration with government agencies.  
Automatic Data Processing
, 313 Ill. App. 3d at 444.  We adopt the rationale employed by the 
Automatic Data Processing
 court in drawing a distinction between regulated and nonregulated investment companies for purposes of qualifying as a financial organization.  We will, however, apply it to the uniformity clause challenge in the case 
sub
 
judice
.  

Once a uniformity challenge is presented, the Department has the burden to establish that there is a real and substantial difference between those taxed and those not taxed and that the tax classification bears some reasonable relationship to the object of the legislation or to public policy.  
Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority
, 172 Ill. 2d 243, 250-51, 665 N.E.2d 1246 (1996).  The uniformity clause does not require perfect rationality as to each taxpayer.  Rather, it imposes only minimum standards of reasonableness and fairness between groups of taxpayers.  
Zunamon v. Zehnder
, 308 Ill. App. 3d 69, 78, 719 N.E.2d 130 (1999).  The legislature, therefore, possesses "wide latitude" in selecting tax classifications.  
Zunamon
, 308 Ill. App. 3d at 78.  In evaluating a uniformity clause challenge, we must presume that the taxing statute is constitutional, and the party challenging it bears the burden of showing that the classification is arbitrary or unreasonable, and if a set of facts can reasonably be conceived that would sustain the classification, it must be upheld.  
Allegro Services, Ltd.
, 172 Ill. 2d at 250-51.  In the instant case, we find that the Department has shown that there is a real and substantial difference between those taxed and those not taxed and that the tax classification bears some reasonable relationship to the object of the legislation and public policy.

This court has upheld classifications similar to the one challenged here under the uniformity clause.  In 
Square D Co. v. Johnson
, 233 Ill. App. 3d 1070, 599 N.E.2d 1235 (1992), the taxpayer there challenged the distinction drawn between aircraft owned, and not used for generating a profit, by a private corporation and that which was used to generate a profit by carriers for hire.  The latter received a use tax exemption where the former did not.  
Square D
, 233 Ill. App. 3d at 1082-83.  There we held that although both groups performed the same activity, there existed a significant difference between them because one was engaged in a profit-generating activity and was subject to various other taxes and fees, whereas the other did not fly solely to generate a profit.  
Square D
, 233 Ill. App. 3d at 1082-83.  

Here, we are presented with the same scenario that was raised in 
Square D
.  Taxpayer and a regulated investment company both invest money in securities.  However, regulated investment companies earn income by charging fees and commissions for their services to the public.  ZIH does not charge fees or commissions to taxpayer for its role in investing the funds.  Furthermore, ZIH earns its income by collecting interest realized on the principle placed into a professionally managed fund. 

We reject taxpayer's challenge because regulated investment companies, as was the case in 
Square D
 with passenger airlines, are subject to enhanced scrutiny by the regulatory agencies and additional financial burdens relative to that regulation.  Accordingly, taxpayer has neither shown that ZIH should be classified as a financial organization nor that the classification is arbitrary or unreasonable.  

VII. Conclusion

We hold that taxpayer failed to show by clear and convincing evidence that ZDI and ZII should be excluded from its unitary group.  More specifically, the trial court's finding that activities within the United States were substantial and should have been included in the payroll calculation for purposes of the 80/20 rule was not against the manifest weight of the evidence.  We also hold that the taxation of ZIH's income to the extent that it was minimally connected to Illinois did not violate the due process and commerce clauses of the United States Constitution.  Further, ZIH's income was business income that was taxable on an apportioned basis in Illinois to the extent that it was used to effectuate the acquisition of Brooks, but the remaining funds not used to acquire corporations were nonbusiness income, even though they were available for use in corporate acquisitions.  Finally, ZIH is not considered a financial organization for purposes of apportioning its income under section 1501(a)(8) of the Act (35 ILCS 5/1501(a)(8) (West 2000)) and the distinction drawn between regulated and nonregulated investment companies does not violate the uniformity clause of the Illinois Constitution.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.  

GORDON, P.J., and SMITH, J., concur.

FOOTNOTES
1:
The record indicates that ZIH loaned Preston 544,990 British Pounds that was determined to be about $828,025.